# Pennsylvania Game Commission v. Craine

*Kent & Kent,* for appellant.
*Stuart A. Culbertson,* for Commonwealth.

MOOK, P. J., April 14, 1956.—The Pennsylvania Game Commission revoked the hunting license of the above named defendant for a period of one year beginning September 1, 1955. An appeal was filed in this court pursuant to the provisions of The Game Law of June 3, 1937, P. L. 1225, sec. 315, as amended by the Act of June 3, 1953, P. L. 270, sec. 1, 34 PS §1311.315.

Section 315 of this act provides:

"(1) The commission may revoke any hunter's license and deny any person the right to secure a license or to hunt or trap anywhere in this Commonwealth, with or without a license, if said licensee or person has either been convicted or signed an acknowledgment of violating any provisions of this act, or if such person has been adjudged guilty, in the manner hereinafter provided, of any of the acts enumerated below, for such periods as hereinafter specified.

"(2) Whether or not legal proceedings have been taken for the arrest and conviction of the offender, the director, through a referee appointed by him, shall have authority to hold a hearing, and shall have the power to subpoena witnesses, expert and otherwise, to administer oaths and to require and receive sworn or affirmed written statements, in any case where any person who, according to information received, while hunting or trapping is alleged:

"(a) To have been guilty of mutilating or carrying away notices posted by the Commonwealth;

"(b) To have done damage to real or personal property of any kind;

"(c) To have caused a forest fire;

"(d) To have been found under the influence of intoxicating liquor or narcotic drugs while carrying or using firearms, or a bow and arrow;

"(e) To have committed an assault upon a landowner or lessee, or employe of such landowner or lessee;

"(f) To have injured a human being by gunfire, or with a bow and arrow;

"(g) To have inflicted an injury upon himself or otherwise been guilty of carelessness or negligence with firearms, or with a bow and arrow;

"(h) To have upon request failed or refused to render assistance where any person was injured in a hunting or trapping accident;

"(i) To have caused such an accident and fled or failed to render assistance in a hunting or trapping accident;

"(j) To have violated any other safety provision of this act not specifically above designated."

The latter section referred to above further provides for a hearing to be held before a referee who shall submit his findings of fact and recommendations to the commission and upon such findings the commission is authorized to revoke the license of the offender and deny him the right to hunt or trap within the Commonwealth, with or without a license, for the periods hereinafter provided.

In the instant case defendant was never convicted of any violation of The Game Law but the commission did conclude after a hearing before a referee that Mr. Craine had inflicted an injury upon himself with a shotgun and, therefore, violated section 2, subsection ($g$) of the statute hereinbefore quoted and, accordingly, revoked his license or his right to hunt within this Commonwealth for a period of one year.

Upon appeal to the court, a hearing was held de novo as required by the statute. From the evidence produced at said hearing, we make the following

### Findings of Fact

1. Cecil L. Craine is a resident of the city of Meadville, Crawford County, and during the year of 1954 was the holder of a hunting license permitting him to hunt game in the Commonwealth of Pennsylvania under the provisions of The Game Law.

2. Mr. Craine is 53 years of age and is the owner and manager of the Meadville Laundry and Dry Cleaning Company. He has been hunting in the Commonwealth for a period of 35 to 40 years and has never been convicted of any violation of The Game Law and prior to the accident involved in this case

had never injured himself or any other person while engaged in hunting.

3. On the morning of October 30, 1954, Mr. Craine accompanied by Mr. Sam Lyons and Mr. Harry Lewis went to the property of Mrs. Shearer, a sister-in-law of Mr. Lyons, where they intended to hunt for rabbits. It was lawful for licensed hunters to hunt rabbits at said time and place.

4. The three men reached the Shearer farm about 9 a. m. They removed their dogs from the car and put on their hunting clothes and proceeded through the farmyard towards the area in which they expected to hunt. As they so proceeded, Mr. Lyons and Mr. Lewis were walking ahead of Mr. Craine.

5. Mr. Craine was using an Ithaca Featherweight 12-gauge shotgun which he loaded when he got out of the farmyard. The gun used by Mr. Craine at that time was equipped with a device known as a polychoke on the end of the barrel which controls the spread of the shot from the shotgun shell.

6. As Mr. Craine proceeded along he remembered that he had been hunting ducks the last time he had used the gun and decided to adjust the polychoke in order to open up the pattern. Accordingly, he turned his back to his hunting companions and faced in the opposite direction, lifted the gun in the air and grasped the polychoke with his left hand in order to turn it to make the proper adjustment. He was wearing a pigskin glove and as he placed his hand around the end of the barrel to adjust this device the end of his thumb protruded slightly over the end of the barrel.

7. The polychoke turned with some difficulty and while attempting to make the adjustment the gun accidentally discharged with the result that the shot blew off the end of Mr. Craine's left thumb.

8. Mr. Craine was unable to state what caused the gun to go off as he put the safety on it immediately after the gun was loaded and he did not consciously disengage the safety or pull the trigger while he was attempting to adjust the polychoke.

9. As previously stated, the gun was pointed into the air away from Mr. Craine's hunting companions and no one else was injured as a result of the accident nor was any one else endangered.

10. After the accident took place, Mr. Craine had the polychoke removed from his gun and has not used one since.

### Discussion

The findings that we have made are not essentially different from those made by the game commission referee and, therefore, we have not discussed at length the testimony of any of the witnesses. The evidence submitted by the Commonwealth was given by Mr. W. T. Campbell who served as referee in this case and Mr. Kepler who is the local game warden and their testimony was a restatement of the testimony given by Mr. Craine himself. Thereafter we heard the testimony of Mr. Craine and his two hunting companions who bore out Mr. Craine's statement as to how the accident took place. From these facts, according to the certified record of the proceedings before the commission, the referee found as a fact that:

"(1) A human being, namely Cecil L. Craine was injured by the discharge of a firearm while hunting or trapping on the 30th day of October 1954 in the County of Crawford, Commonwealth of Pennsylvania.

"(2a) That the injury was self-inflicted.

"(3) That the payment of hospital and medical services required by the victim have been satisfactorily adjusted."

The referee, thereupon, filed his recommendation that Mr. Craine's license be revoked for one year.

Upon submission of the referee's recommendation the record shows the following finding by the commission:

"The Commision, after full consideration, having found that each of the persons below indicated was guilty of having violated one or more of the provisions of the previously cited Section and Act, (Clause 2 of Section 315), by separate resolution in each case unanimously agreed to, under authority vested in it by the act aforesaid, denies the right to secure a license or to hunt or trap anywhere in this Commonwealth with or without a hunter's license, until after the date indicated opposite each name below, beginning with September 1, 1955."

Apparently the commission heard a number of cases and disposed of them together as the next page of the transcript lists Mr. Craine as no. 12: Offense, self-inflicted injury; revocation recommended until August 31, 1956.

We have already set forth the complete text of clause 2, sec. 315 of The Game Law. Reference to this text will show that the violation complained of is subsection (g) which provides:

"To have inflicted an injury upon himself or otherwise been guilty of carelessness or negligence with firearms, or with a bow and arrow."

The referee found as a fact that Mr. Craine inflicted an injury upon himself but he did not find that the injury was self-inflicted through negligence or carelessness in the use of his gun.

The first question in this appeal, therefore, is whether or not the mere fact that Mr. Craine shot off the end of his thumb is a violation of this act and will warrant the game commission revoking his hunting license. We have not been able to find where this

statute has ever been construed by any court of record. We have been unable to find any decisions either of the appellate courts or the lower courts of the Commonwealth relating to this section and neither counsel has furnished us any. Therefore, we must reach our decision on the basis of the language of the act itself with application of reason and common sense.

While the acts set forth in section 315 of the statute are not specifically made crimes, yet the statute is penal in nature in that a penalty is prescribed in the form of a revocation of a license or the right to hunt and since it is, therefore, a penal statute it must be strictly construed: Statutory Construction Act of May 28, 1937, P. L. 1019, sec. 58, 46 PS §558; LaBrum et al. v. Com. Title Co. of Philadelphia, 358 Pa. 239; Com. v. Gill, 166 Pa. Superior Ct. 223; Com. v. Yaste et al., 166 Pa. Superior Ct. 275.

It is interesting to note that in both of the latter two cases above cited the court said that penal statutes must be strictly construed but such statutes must be construed with common sense. In the Yaste case, the court said, 166 Pa. Superior Ct. 278:

". . . the canon of strict construction of a penal statute is not an inexorable command to override common sense and evident statutory purpose. As was said in United States v. Gaskin, 320 U. S. 527, 530, 64 S. Ct. 318, 319, 88 L. Ed. 287: '(the canon) does not require distortion or nullification of the evident meaning and purpose of the legislation.' 'Nor does it demand that a statute be given the "narrowest meaning"; it is satisfied if the words are given their fair meaning in accord with the manifest intent of the lawmakers': United States v. Brown, 333 U. S. 18, 68 S. Ct. 376."

While in that case the common sense viewpoint clearly indicated that under the acts complained of, a violation of the law occurred, yet the common sense

viewpoint should control even if the converse were true.

It is entirely clear from the reading of section 315 of The Game Law that the thing which the legislature intended was to prevent the careless handling of firearms which might result in injuries to persons or property and not merely to hold that any person that was injured should be punished regardless of whether carelessness or negligence were involved. Here the section reads:

"To have inflicted an injury upon himself or *otherwise* been guilty of carelessness or negligence with firearms . . ."

Certainly the use of the word "otherwise" in connection with the second part of the sentence indicates that negligence or carelessness therein referred to applies to the self-infliction of injury as well. If this were not so it would have been entirely unnecessary to have inserted the word "otherwise" for the statute could have been written then "to have inflicted an injury upon himself or been guilty of carelessness or negligence with firearms". We, therefore, believe that before the game commission may revoke a license for hunting it must find that the injury was self-inflicted by negligence or carelessness on the part of the hunter and we think this is the common sense view of the situation.

It may be argued that in any case when a person discharges a gun in such a manner as to injure himself or some other person, that some carelessness is involved. But this does not follow because negligence is never presumed and it is a well established principle in our law that the mere happening of an accident does not mean that anyone was negligent: Logan to use v. Bethlehem City, 324 Pa. 7. As stated in Dahlstrom v. Shrum, 368 Pa. 423, 425:

"Negligence is defined as the absence of care under the circumstances: Beck v. Stanley Company of America, 355 Pa. 608, 50 A. 2d 306; Palsgraf v. Long Island R. Co., 248 N. Y. 339, 162 N. E. 99. The test of negligence is whether the wrongdoer could have anticipated and foreseen the likelihood of harm to the injured person, resulting from his act: Scurfield v. Federal Laboratories, Inc., 335 Pa. 145, 6 A 2d 559. In Palsgraf v. Long Island R. Co., supra, it was stated by Cardozo, C. J. (later Justice, United States Supreme Court) : '. . . the orbit of the danger as disclosed to the eye of reasonable vigilance would be the orbit of the duty.' "

A man who goes out to hunt with a loaded gun certainly has a duty to refrain from injuring himself or other persons by an unreasonable or careless use of his firearm. But the fact that the gun accidentally discharged and someone is injured does not alone establish negligence. As stated above the test is whether the person engages in conduct amounting to a careless disregard of the rights and safety of himself and others, the consequence of which could have been foreseen by the actor: Cf. ALI Restatement of the Law of Torts, §§500, 502.

In the instant case the referee did not find that defendant was negligent or careless and, therefore, upon the record, the commission should not have revoked his license. However, upon appeal to the court, the case is heard de novo and if the court, therefore, should find that the defendant was guilty of negligence or carelessness in the handling of his gun as a result of which he inflicted a wound upon himself, then, since it is the duty of the court to determine whether petitioner is subject to revocation of his license, we would be obliged to sustain the revocation.

As we have indicated before, there is no judicial authority upon the subject but it seems to us that the

situation is quite similar to the function and duty of the courts in cases involving the suspension of the license to operate motor vehicles. This language of the statutes is almost identical. In The Vehicle Code, Act of May 1, 1929, P. L. 905, art. VI, sec. 616, as amended, 75 PS §193, the statute provides that upon appeal to the common pleas court:

"Such courts are hereby vested with jurisdiction, and it shall be their duty, to set the matter down for hearing upon thirty (30) days' written notice to the secretary, and thereupon to take testimony and examine into the facts of the case, and to determine whether the petitioner is subject to suspension of operator's license or learner's permit . . ."

In The Game Law the amended statute provides:

"(Common Pleas) courts are hereby vested with jurisdiction, and whose duty it shall be to set the matter down for hearing upon thirty (30) days written notice to the director, and to determine whether the petitioner is subject to revocation of license."

The section of The Vehicle Code referred to was considered at length by the Supreme Court in the case of Com. v. Funk, 323 Pa. 390. The court said, p. 399:

"The language of the section clearly indicates that it is the duty of the court to hear de novo the witnesses of the Commonwealth and the witnesses of the licensee, and, from the testimony taken, to determine anew whether the operator's license should be suspended."

We are, therefore, of the opinion that in the present case the court should determine anew from the testimony taken before us whether defendant's hunting license should have been revoked.

Again in Com. v. Wagner, 364 Pa. 566, the Supreme Court considered the meaning of this section of The Vehicle Code at p. 570:

"Nor has there been any doubt as to the meaning of the ruling in the Funk case, supra, with respect to

Sec. 616 of The Vehicle Code. In Commonwealth v. Cronin, 336 Pa. 469, 474, 9 A 2d 408, it was said that '. . . the hearing de novo in the court below protected defendant against an arbitrary exercise of power on the part of the Secretary.' Again in Handwerk Automobile License Case, 348 Pa. 263, 264-265, 35 A. 2d 289, the late Mr. Justice Patterson said and emphasized that *'The obvious intent of the legislature was to vest in the several courts of common pleas broad discretionary power* . . . In the exercise of the broad power thus conferred by the legislature, the courts are to administer justice according to the evidence and circumstances presented . . .' "

Now, then, in the administration of reason and justice, is defendant in this case guilty of conduct which justifies the revocation of his right to hunt game in this Commonwealth for a period of one year? We presume it may be argued that he should not have attempted to adjust the polychoke until he had unloaded the gun but his failure to unload the gun does not necessarily involve negligence or carelessness. This polychoke is simply a device that fits on the end of the gun barrel something like a collar on a pipe and one can grasp that by the hand the same as he can grasp the barrel of the gun and do no harm to himself. The safety device on Mr. Craine's gun was attached for the purpose of preventing the gun from going off and Mr. Craine put the safety on after he loaded the gun. He, therefore, had no reason to foresee that the gun would go off. Nonetheless, when he attempted to adjust the polychoke, he turned away from his hunting companions, pointed the gun in the air and put his left hand on the polychoke to try and turn it. It happened that it turned harder than he anticipated it would and in making the turn he got his thumb slightly over the barrel of the gun and unfortunately for him the gun went off. How it happened

he doesn't know. He didn't consciously pull the trigger or disengage the safety but nonetheless in some manner the gun was discharged. Was this negligent conduct? We think this is at least open to question.

Our own hunting experience is very slight, but we believe it is accepted practice for hunters to load their guns upon entering a woods where they expect to find game. We also think that ordinarily no particular danger would be involved to the hunter in adjusting the polychoke on the gun, and there was, therefore, no reason for Mr. Craine to anticipate harm to himself or any other person. He had no reason to suspect that the gun would go off as long as he had the safety catch on.

But even if we did conclude that Mr. Craine was negligent in the handling of his gun on this occasion, there is still the question of whether it is the type of negligence that requires the punitive action taken by the game commission. This question has been considered by the courts in connection with the operation of motor vehicles. For example, The Vehicle Code hereinbefore referred to provides that the Secretary of Revenue may suspend the operator's license of any person who has been involved in a fatal accident but the Supreme Court has decided that merely being involved in a fatal accident does not justify the Secretary in suspending the operator's license, but only where the operator has been guilty of negligence or recklessness resulting in a fatal accident should the license be suspended: Com. v. Cole, 350 Pa. 369. Considering this further the Supreme Court said in the case Com. v. Bushey, 368 Pa. 67, 68:

"In construing the above section of the Act, this Court decided in Commonwealth v. Cole, 350 Pa. 369, 39 A 2d 361, that where a defendant was operating a motor vehicle involved in an accident resulting fatally to a person, a court may properly reinstate the license

where negligence by the operator is not proved. By the use of the word 'negligence', we necessarily implied negligence of such a character that, in the discretion of the court, the defendant should have inflicted upon him the punitive penalty of having his license suspended and that the public required such protection."

Again in Levengood Appeal, 377 Pa. 301, 303, in construing the same section the Supreme Court said:

"A suspension of a driver's license is not required solely because he (the operator) was involved in a fatal accident wherein he was guilty of negligence. Negligence alone is insufficient. The negligence must be of such nature, in the discretion of the hearing judge, as to warrant such punitive punishment necessary for the protection of the public."

The permission to hunt game, like the right to operate a motor vehicle is not a right but a privilege (Com. v. Patsone, 231 Pa. 46) and we, therefore, believe that the decisions of The Vehicle Code are analogous to the statute now before us. In Com. v. Funk, supra, page 395, the court said:

"The permission to operate a motor vehicle upon the highways of the Commonwealth is not embraced within the term civil rights, nor is a license to do so a contract or a right of property in any legal or constitutional sense. Although the privilege may be a valuable one, it is no more than a permit granted by the state, its enjoyment depending upon compliance with the conditions prescribed by it, and subject always to such regulation and control as the state may see fit to impose."

We think this applies equally to the right to carry firearms. Therefore, it is our conclusion that in considering the provisions of section 315 of The Game Law, we should apply the rules laid down in the motor vehicle cases and hold that the negligence here too

must be of such a nature as to warrant such punishment as may be necessary for the protection of the public. In our judgment defendant in this case is guilty of no such negligence. The testimony shows that defendant has been hunting for 35 or 40 years and the evidence given by his hunting companions is that he has always been an extremely careful hunter. On this occasion he exercised care so that he would not do harm to anyone else but by an unforeseen accident he injured himself. We see nothing about the circumstances of this accident which, in reason and justice, requires the revocation of his hunting license for the protection of himself or the public. As the court said in Levengood Appeal, supra:

"Whatever negligence may have existed, it does not appear to us to require punitive punishment."

We, therefore, believe that the game commission erred in revoking defendant's license. Entertaining these views, we enter the following

### Order

And now, April 14, 1956, after hearing in the above entitled case and upon consideration of the testimony the order of the Game Commission of Pennsylvania revoking the hunting license of the above named defendant, Cecil L. Craine, is vacated and set aside.