## Commonwealth, Appellant, *v.* Agway, Inc.

Argued March 13, 1967. Before ERVIN, P. J., WRIGHT, WATKINS, MONTGOMERY, JACOBS, HOFFMAN, and SPAULDING, JJ.

*Richard H. Kutz,* Deputy Attorney General, with him *Edward Friedman,* Counsel General, and *William C. Sennett,* Attorney General, for Commonwealth, appellant.

*Richard C. Fox,* with him *McNees, Wallace & Nurick,* for appellee.

OPINION BY JACOBS, J., June 16, 1967:

The Commonwealth of Pennsylvania brought this suit in trespass to recover damages for the value of fish killed as a result of pollution of the South Branch of French Creek and French Creek near Union City. The complaint alleged that the discharge of certain chemicals into the creek caused the death of some 12,000 fish and 60,000 minnows, all such fish being in a state of freedom in the inland waters of the Commonwealth.

The court below dismissed the complaint on the grounds that the Commonwealth did not have a property interest in such ferae naturae that would support a suit in trespass for damages, and that the exclusive remedy for the Commonwealth was the penal provisions of The Fish Law of 1959, Act of December 15, 1959, P. L. 1779, as amended, 30 P.S. §1 et seq.[1]

The controlling question in this case is whether the Commonwealth has a property interest in fish in a state of freedom, the invasion of which will support an action in trespass for monetary damages. We agree with the court below that the Commonwealth has no such property interest and affirm the dismissal of the complaint.

Fish running wild in the streams of a state or nation are ferae naturae. 2 Blackstone, Commentaries 403. They are not the subject of property until they are reduced to possession, *Wallis v. Mease,* 3 Binney 546 (1811), and, if alive, property in them exists only so long as possession continues. See, e.g., *Mullett v.*

---

[1] That act provides, inter alia: "§200. No person shall put or place in any waters within or on the boundaries of this Commonwealth any electricity, explosives or any poisonous substances whatsoever for the purpose of catching, injuring or killing fish. . . . No person shall allow any substance of any kind or character, deleterious, destructive or poisonous to fish, to be turned into or allowed to run, flow, wash or be emptied into any waters within this Commonwealth, unless it is shown to the satisfaction of the Commission or to the proper court that every reasonable and practicable means has been used to abate and prevent the pollution of waters in question by the escape of deleterious substances.

"§202. Any person violating the preceding provisions of this article shall, on conviction as provided in chapter 14 of this act, be sentenced to pay a fine of not less than one hundred dollars ($100.00) nor more than one thousand dollars ($1,000.00).

"§310. It is the intent of this act to prescribe an exclusive system for the angling, catching and taking of fish, and for their propagation, management and protection in waters within, bounding on, or adjacent to, this Commonwealth. . . ."

*Bradley,* 24 Misc. 695, 53 N.Y.S. 781 (1898); *Reese v. Hughes,* 144 Miss. 304, 109 So. 731 (1926); *James v. Wood,* 82 Me. 173, 19 A. 160 (1889); *Young v. Hichens,* 1 Dav. & Mer. 592, 6 Q.B. 606 (1844). The Commonwealth does not allege a property interest by way of possession of the fish. Instead, it admits the fish were in a state of freedom in Pennsylvania waters, but asserts that it has a property interest either as sovereign or proprietor in all wild game and fish in the Commonwealth sufficient to allow its recovery of damages.

Neither this court nor the court below nor the Commonwealth has discovered any case which has held that a state has such a property interest in wild game and fish that it could be the subject of a tortious invasion. To support its position the Commonwealth relies on cases involving the validity of regulatory measures enacted by states to preserve and protect wild game, and argues that since such cases refer to wild game as the property of the state, it follows that the state also "owns" wild game for purposes of a suit in trespass.

Game and fish in a wild state often have been described as the property of the state, but an examination of the cases demonstrates that the interest of the state is that of a sovereign, not an owner. Thus in *Commonwealth v. Papsone,* 44 Pa. Superior Ct. 128 (1910), aff'd, 231 Pa. 46, 79 A. 928, 232 U.S. 138, 34 S. Ct. 281, 58 L. ed. 539 (1914), although this court referred to wild animals as the property of the sovereign, the case itself involved only the validity of hunting regulations and the holding was based solely on the sovereign power of the state to regulate and prohibit hunting and did not depend on any state property rights in the wild game.

In *McCready v. Virginia,* 94 U.S. 391, 24 L. ed. 248 (1877), all that was decided was that the state could reserve to its own residents the exclusive right to grow

oysters on the bed of a tidal river. While the case refers to the state as owning the tide waters and the fish in them it recognizes the limited meaning of such ownership by saying "so far as they are capable of ownership while running." Likewise in *Geer v. Connecticut,* 161 U.S. 519, 16 S. Ct. 600, 40 L. ed. 793 (1896), in holding that Connecticut could prohibit the transportation of any killed game beyond the state the court based its decision on the power of the state to regulate the acquisition of title by an individual. Both cases demonstrate the exercise of the sovereign power and not the assertion of proprietary rights of the state.

In two instances the United States Supreme Court has referred to state ownership of wild game with some skepticism. In *Missouri v. Holland,* 252 U.S. 416, 434, 40 S. Ct. 382, 64 L. ed. 641, 648 (1920), Justice Holmes said of the proposition that states own wild game: "To put the claim of the state upon title is to lean upon a slender reed. Wild birds are not in the possession of anyone; and possession is the beginning of ownership." In *Toomer v. Witsell,* 334 U.S. 385, 68 S. Ct. 1156, 92 L. ed. 1460 (1948), the Supreme Court found a violation of the Privileges and Immunities Clause in a South Carolina statute which imposed a fishing license fee on nonresidents 100 times greater than the fee imposed on residents. The court said there: "The whole ownership theory, in fact, is now generally regarded as but a fiction expressive in legal shorthand of the importance to its people that a state have power to preserve and regulate the exploitation of an important resource." 334 U.S. 402, 92 L. ed. 1474. The confusion as to whether a state owns fish in the sense of owning other state property was traced by the court to Roman times: "The fiction apparently gained currency partly as a result of the confusion between the Roman term imperium, or governmental power to regulate, and dominium or ownership. Power over

fish and game was, in origin, imperium." Ibid at footnote 37.

Regardless of the terminology historically applied, we deal here with a power of the state to preserve and control a natural resource for the enjoyment of all citizens. The Commonwealth has the power for the common good to determine when, by whom and under what conditions fish running wild may be captured and thus owned and the power to control the resale and transportation of such fish thereby qualifying the ownership of the captor. It has this power as a result of its sovereignty over the land and the people. But it is not the owner of the fish as it is of its lands and buildings so as to support a civil action for damages resulting from the destruction of those fish which have not been reduced to possession.

Affirmed.

CONCURRING OPINION BY WRIGHT, J.:

I am not prepared to agree with the majority that the Commonwealth lacks sufficient property interest in fish upon which to predicate a trespass action for their negligent destruction. Fish constitute an important natural resource providing both food and recreation for our citizens. The Pennsylvania Fish Commission operates a number of hatcheries and regularly stocks the waters of the Commonwealth, including the stream here involved. I am concurring in the result on the ground, primarily relied upon by the court below, that The Fish Law of 1959 contains an express statement by the legislature that it is intended "to prescribe an exclusive system for . . . their propagation, management and protection".