133 N.J. Super. 375 (1975)
336 A.2d 750
STATE OF NEW JERSEY, DEPARTMENT OF ENVIRONMENTAL PROTECTION, PLAINTIFF-RESPONDENT AND CROSS-APPELLANT,
v.
JERSEY CENTRAL POWER & LIGHT COMPANY, A NEW JERSEY CORPORATION, DEFENDANT-APPELLANT AND CROSS-RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued October 30, 1974.
Decided March 21, 1975.
*379 Before Judges MATTHEWS, FRITZ and BOTTER.
*380 Mr. Robert O. Brokaw argued the cause for appellant Jersey Central Power & Light Company.
Mr. Lewis Goldshore, Deputy Attorney General, argued the cause for respondent State of New Jersey (Mr. Robert J. Del Tufo, Acting Attorney General, attorney; Mr. Stephen Skillman, Assistant Attorney General, of counsel).
The opinion of the court was delivered by MATTHEWS, P.J.A.D.
Defendant was charged by plaintiff Department of Environmental Protection (DEP) with violations of N.J.S.A. 23:5-28 and 58:10-23.6 in the operation of its nuclear generating plant located at Oyster Creek in Lacey and Ocean Townships, Ocean County. The first two counts of the complaint charged the statutory violations and sought penalties, and the third count sought compensatory damages for the harm done to public resources. At the conclusion of a six-day nonjury trial, the trial judge dismissed the second count charging a violation of N.J.S.A. 58:10-23.6, and thereafter, in a reported opinion, found that defendant violated N.J.S.A. 23:5-28 and imposed a penalty of $6,000. He also awarded $935 to the State as damages for fish killed. State v. Jersey Central Power & Light Co., 125 N.J. Super. 97 (Law Div. 1973).
Defendant's atomic power generating plant is situated on a tract of land bounded by the south branch of the Forked River on the north, Oyster Creek on the south and U.S. Highway Route 9 on the east. During construction of the plant an artificial canal was dug which connected the river and the creek which previously had not been connected. A dike was constructed across the canal which divided it into an intake portion and a discharge portion. The dike prevents the flow of water between the river and creek unless it is pumped. Seven pumps are located in the nuclear generating station, four circulating pumps each with a capacity of 115,000 gallons a minute and three dilution pumps each having 260,000 gallons a minute capacity.
*381 When the plant is in operation, cooling water is pumped by the four circulating pumps from Forked River into an intake canal, through the condensers under the generators where it is heated about 48 degrees in the process of condensing steam and is then discharged into the discharge canal and thence into Oyster Creek. The water discharged into the creek is approximately 25 degrees Fahrenheit warmer than the water in the river. The warm water discharge raised the temperature of the creek waters which had the effect of attracting fish. In addition, the three dilution pumps pump water directly from the intake canal into the discharge canal. The discharge of the combined operation of the pumps serves to satisfy the minimum requirements established by the Atomic Energy Commission for the dilution of such radioactive liquid effluents which may be discharged in operation of the generator.
Defendant has been issued a provisional operating license by the Atomic Energy Commission under which it currently operates the Oyster Creek facility. That license incorporates various technical specifications which govern the method of operation. Among those is the requirement to shut down the nuclear reactor when unidentified leakage of reactor coolant into the primary containment reaches a rate of five gallons per minute.
On January 28, 1972 it was determined that unidentified leakage of reactor water inside the primary containment was approaching the allowable maximum under the specifications. Consequently the plant was shut down on that date. On the shutdown date and for three days thereafter three circulating pumps and one dilution pump continued in operation. Since the plant was no longer operating, the discharge of heated water stopped and only the colder river water was pumped into the creek. As a result the temperature of the creek fell rapidly  approximately 13 degrees in 24 hours.
*382 Thereafter, upwards of 500,000 menhaden, a species of fish important for commercial uses, were found dead in the creek. Examination of the water in the creek and samples of the dead fish by state inspectors disclosed no matter harmful or injurious. Death of the menhaden was therefore attributed to the thermal shock caused by the sudden drop in water temperature.

I
The first issue raised is whether N.J.S.A. 23:5-28 applies to the discharge of uncontaminated, unheated water into tidal waters of the State. It is conceded that Oyster Creek is subject to tidal flow[1]. The statute, in pertinent part, reads:
No person shall put or place into, turn into, drain into, or place where it can run, flow, wash or be emptied into, or where it can find its way into any of the fresh or tidal waters within the jurisdiction of this State any petroleum products, debris, hazardous, deleterious, destructive or poisonous substances of any kind; * * *. In case of pollution of said waters by any substances injurious to fish, birds or mammals, it shall not be necessary to show that the substances have actually caused the death of any of these organisms. * * *
It also includes a penalty not to exceed $6,000 for its violation.
Defendant argues that if the Legislature intended this statute to prohibit the discharge of heated or cold water into the State's waters, it would have provided by "apt legislative language" that thermal pollution constituted a violation of the statute. It also contends that since the Legislature *383 referred to thermal pollution in N.J.S.A. 13:1D-9, the absence of such a reference in the statute here under consideration unquestionably indicates that the Legislature did not intend to include thermal pollution within the prohibitions of N.J.S.A. 23:5-28.
We are unimpressed with this argument. First, we are satisfied that the plain meaning of the statute embraces the conduct which was prosecuted here. The Legislature clearly intended to prohibit the discharge of any substance into the waters of this State which would be hazardous, deleterious, destructive or poisonous to any form of life. The facts adduced at the trial below disclose that the introduction of the cold water into the artificially heated environment of Oyster Creek in which the menhaden were living caused their destruction. Obviously, the introduction of the cold water was deleterious to the health of the menhaden  they died. Things cannot be more deleterious than that. Second, this clear import of the statute is supported by its legislative history. As the trial judge noted in his opinion, one of the senators speaking on behalf of the sponsor of the legislation while it was pending in the Senate noted that the intent in enacting the bill was not to try to define, as the law then did, any of the specific substances that would cause contamination. "Rather the object of the legislation is to say that anyone who permits any injurious substances which have effects that are detrimental to the inhabitants of the waterways shall be responsible for doing it." See 125 N.J. Super. at 100-101.
Defendants argument would have us ignore the words employed by the Legislature in the statute. The words "hazardous", "deleterious," "destructive" and "poisonous" all have different shadings of meaning. Water, for example is not hazardous, deleterious, destructive or poisonous to fish. Water which unduly raises or lowers the temperature of water then constituting the environment of fish can be hazardous, and may become deleterious and destructive to the fish, although *384 never poisonous to them. What the Legislature has sought to do in employing the general language that it has, is to prohibit the discharge of any substance, the effect of which will endanger or destroy the eco-system, its inhabitants and human life.
Defendant also argues that the Legislature intended by the passage of this act to prohibit the discharge of substances whose chemical composition is such as to make them inherently hazardous, deleterious, destructive or poisonous. Only a tortured reading of the statutory language can lead to such a result. Perhaps the best answer to this argument is a reference to the predecessor statutes covering this subject. N.J.S.A. 23:5-28 had as its source L. 1937, c. 64, § 2. That section prohibited the discharge of any "dyestuff, coal tar, sawdust, tanbark, lime, refuse from gas houses, or other deleterious or poisonous substances" into any of the waters of the State in quantities destructive of life or disturbing the habits of fish inhabiting those waters. A 1950 amendment to the statute made no change pertinent here. The statute was again amended by the L. 1968, c. 329. That amendment deleted the specification of the particular prohibited substances as well as the words "in quantities destructive of life or disturbing the habits of fish." The statute then read:
No person shall put or place into, turn into, drain into, or place where it can run, flow, wash or be emptied into, or where it can find its way into any of the fresh or tidal waters within the jurisdiction of this State any * * * deleterious, destructive or poisonous substances of any kind; * * *.
The statute remained in this form until it was again amended to its present form by L. 1971, c. 173. The last amendment inserted specific references to petroleum products and debris, and added the word "hazardous" as an additional description of the character of substances prohibited.
In our view, the legislative history just set forth demonstrates a legislative intent to prohibit any discharge *385 into the waters of this State by anyone if such discharge will be hazardous, deleterious, destructive or poisonous to life. The significance of the specific reference to petroleum products and debris is fairly apparent. Petroleum products are not generally miscible with water and usually float on its surface, causing problems different from those discharges which readily mix with the water. The term "debris," which would include such things as building materials, old tires and metal, would cause a still further hazard, for example, physical damage to individuals and inhabitants of the waters.
We cannot accept defendant's contention that because the term "hazardous substances" is defined in N.J.S.A. 58:10-23.3 as "such elements and compounds which, when discharged in any quantity into * * * the waters of this State * * * presents a serious danger to the public health or welfare, including but not limited to, damage to the environment, fish, shellfish, wildlife, vegetation, shorelines, stream banks, and beaches," the statute here under consideration must be construed to prohibit only those substances which by their chemical composition are hazardous, deleterious, destructive or poisonous, no matter how small the amount discharged, or regardless of the conditions or circumstances under which the discharge occurs. The argument is non sequitur. Perhaps the definition of hazardous substances contained in N.J.S.A. 58:10-23.3 would be helpful in determining what that term means as used in N.J.S.A. 23:5-28. It does not, in our opinion, shed any light on the definition of the other adjectives employed.

II
Defendant argues that the construction placed upon N.J.S.A. 23:5-28 by the trial judge and its application to defendant's conduct deprive the defendant of due process of law. The trial judge held that cold water may be a pollutant in one instance and not in another, and that its discharge by *386 defendant into the warmer water of Oyster Creek constituted the introduction of a deleterious substance into those waters in violation of N.J.S.A. 23:5-28. Defendant contends that by construing the statute in this manner the trial judge has rendered it unconstitutional because of vagueness. It contends that under that construction the question of violation of the statute would depend upon conduct which would not be regarded as prohibited in advance.
Defendant's argument in this connection relies to a great extent on its urged construction of the statute which would prohibit the discharge of only those substances which are inherently hazardous, deleterious, destructive or poisonous, a construction which we have rejected. The argument also somewhat conveniently overlooks defendant's knowledge that the normal operation of its generating plant caused the elevation of the temperature of Oyster Creek, which in turn attracted fish to the area at times when they ordinarily would not have been present. Defendant does not assert that it was ignorant of the fact that a sudden lowering of the temperature of the waters would have a deleterious effect on those fish. A clear object of the statute is to prevent discharges harmful to life in the waters of this State, an appropriate regulatory object of the Legislature. Since the conduct sought to be controlled is not fairly susceptible to precise definition, general language may constitutionally be employed. State v. New York Central R.R. Co., 37 N.J. Super. 42 (App. Div. 1955). We find the language employed by the Legislature in N.J.S.A. 23:5-28 meets the constitutional test.

III
Defendant also claims that the trial judge erroneously considered testimony of a legislator given at a hearing on the bill during the course of its passage as extrinsic aid to the construction of N.J.S.A. 23:5-28. Dumont Lowden, Inc. v. Hansen, 38 N.J. 49 (1962), is cited as authority for this *387 proposition. As we noted above, the trial judge, in concluding that the introduction of cold water into Oyster Creek violated the statute, referred to the statement of a legislator given at a public hearing.
Defendant's argument studiously ignores decisions to the contrary beginning with Deaney v. Linden Thread Co., 19 N.J. 578 (1955), in which the scope of legislative history which courts are permitted to examine was expanded to include the legislative introducer's statement attached to a bill at the time of its passage. The later decision in N.J. Pharmaceutical Ass'n v. Furman, 33 N.J. 121 (1960), approved the use of information contemporaneous with the passage of the bill as an aid to statutory construction: ("Courts may, of course, freely refer to legislative history and contemporaneous construction for whatever aid they may furnish in ascertaining the true intent of the legislation." 33 N.J. at 130). More recently, this trend has been evidenced by the approval of the use of letters written by the person suggesting the legislation and statements by the governor in office at the time of its passage, State v. Madden, 61 N.J. 377, 388 (1972); and memoranda prepared by those who took part in the drafting of the legislation. Data Access Systems, Inc. v. State, 63 N.J. 158, 165 (1973); In re Lambert, 63 N.J. 448, 452-453 (1973).
Contrary to defendant's assertions, our courts have adopted the policy of considering a broad spectrum of information (weighing its credibility and relevance) as a tool in determining the intent of the Legislature:
Nor do we think it is improper to consider materials which may never have met the legislative eye. While a proposed enactment may first see the light of day in legislative chambers, its conception and preparation have frequently taken place elsewhere. This is normally true of administrative proposals. Of course such materials must be carefully scrutinized and their weight and authenticity evaluated, but we see no merit in a rule demanding their total exclusion from judicial consideration. [Data Access Systems, Inc. v. State, above, 63 N.J. at 167] *388 Dumont Lowden, Inc. v. Hansen, above, on which defendant relies, is readily distinguishable since it dealt with post-adoption, self-serving statements of legislators. Accordingly, we find it was proper for the trial judge to have considered the assemblyman's explanation of the bill before a committee of the Legislature as an aid to construction.

IV
The third count of the complaint alleged that defendant's negligent or willful acts caused damage to the public resources (fish held by the State in trust for the public) and as a consequence the State was entitled to compensatory damages. Defendant describes this count of the complaint as a claim for damages predicated on common law liability for tort. Defendant now contends that in discharging the cold water into Oyster Creek it performed neither an intentional nor negligent act; further, that it may not be held to a standard of strict liability, and, therefore, it should not be held liable in tort.
The trial judge did not discuss the standards under which he found defendant liable in tort, and, indeed, the State did not discuss either intent or fault concepts during the trial. We find, however, that the evidence presented below established facts which support a determination that defendant was negligent. Its own employees admitted in their testimony, for example, that there were ways alternative to the pumping method employed to dispose of radioactive wastes which may have remained in the plant at the time of its shutdown. Defendant's plant manager informed one of the State's inspectors that he would cease operation of the pumps the next time it became necessary to shut down the condenser. Again, although no immediate fish kills resulted from earlier shutdowns, the fact finder could have found from the evidence that defendant should have known, and probably did know, that continued operation of the circulating *389 and dilution pumps while the condenser was not operating would seriously reduce the water temperature, and that such sharp reduction in water temperature would have damaged aquatic life. Defendant has been licensed by the Atomic Energy Commission to operate its atomic powered generating plant because of its professed expertise in this area. This expertise has been confirmed by the Federal Government. Thus, the standards to be applied here involve that of the reasonably prudent plant operator and not the reasonably prudent man in the street. The elementary physical and thermodynamic phenomena involved here are unquestionably, or should unquestionably be, within defendant's expertise. Considering this observation, there should be no question as to the foreseeability of the results of the cold water pumping operation. Defendant may not be exempted from the use of reasonable judgment merely because prior experiences were such that it did not subjectively expect a fish kill to result from its acts.
The trial judge did not specify, and we do not conclude from the record or his opinion, that he used strict liability standards in reaching his conclusion that defendant was liable under the third count. We find it unnecessary to discuss this issue, although suggested by both parties, because it is apparent that the fish kill was caused solely by the pumping of the cold water which cannot be considered an ultra-hazardous activity. Any radioactive hazard that did exist could have been eliminated simply by turning off the water pumps. The damage that resulted did not occur from the operation of the nuclear generator. It obviously occurred because of a conscious choice exercised by defendant which left the water pumps running while the plant was shut down.
We conclude that the trial judge was presented with sufficient credible evidence from which he reasonably could have concluded that defendant was negligent under the circumstances. State v. Johnson, 42 N.J. 146 (1964).

*390 V
In its fourth and fifth defenses to the State's complaint defendant claimed that the shutdown of its generating plant and the continued circulation of water into the discharge canal were necessitated by requirements contained in its operating license issued to it by the Atomic Energy Commission. In short, defendant claims that unavoidable necessity required it to perform the acts that the State claims constituted the violation of N.J.S.A. 23:5-28 as alleged in the first count of the complaint. Our courts have long recognized the doctrine of unavoidable necessity. See e.g., Weehawken Tp. Bd. of Health v. N.Y. Central R. Co., 4 N.J. 293, 301 (1950); State v. Mundet Cork Corp., 8 N.J. 359, 371 (1952), cert. den. 344 U.S. 819, 73 S.Ct. 14, 97 L.Ed. 637 (1952). We conclude, however, that that defense has no applicability here.
Our review of the record convinces us that defendant failed to meet its burden in showing that it was necessary for it to have operated the circulation and dilution pumps while the plant was shut down. There is nothing in the record to indicate that the plant was emitting radioactive wastes while it was out of operation. Assuming that there was a concentration of radioactive effluent from undetermined sources in the primary containment area at the time of shutdown, that concentration had not, by defendant's assertions, reached the allowable limit at the time of shutdown. It seems probable, therefore, although defendant produced no testimony in this regard, that any radioactive material on the premises would have been satisfactorily diluted fairly promptly by a shorter operation of the pumps. Since no further radioactive emissions came from the plant during shutdown, it should be apparent that the continued operation of the pumps was unnecessary. The record does disclose that the probable explanation of the continued operation of the pumps of the plant after shutdown was for the convenience of defendant. One of the employees *391 defended the continued operation of the pumps during shutdown as a measure to prevent corrosion of the condenser tubes from air and to facilitate resumption of the generator operation after repairs had been effected. This is a far cry from the claimed necessity to dilute atomic wastes. Unquestionably, if defendant proved that it was necessary to continue the pumps in operation while the plant was shut down in order to dilute atomic wastes which were then being produced by the plant, the trial judge would have had to cede to federal authority with respect to the operation of the pumps on the ground of preemption. See Northern States Power Co. v. Minnesota, 447 F.2d 1143 (8 Cir.1971), aff'd 405 U.S. 1035, 92 S.Ct. 1307, 31 L.Ed.2d 576 (1972). The record discloses, however, that defendant utterly failed to carry its burden of proof on the issue of necessity (as distinguished from convenience), and the trial judge, therefore, quite properly refused to employ the doctrine in reaching his conclusions.
In view of our findings here, we regard as frivolous defendant's assertion that the State is attempting to regulate the disposal of radioactive wastes by challenging its decision as and when to operate the pumps. We also note that the federal atomic energy statutes and regulations, which are clearly preemptive, specifically provide in 42 U.S.C.A., § 2021 (k) that nothing therein should be construed to affect the authority of any State to regulate activities for purposes other than protection against radiation hazards. Northern States Power Co. v. Minnesota, above, is not to the contrary.

VI
Both parties agree that the State has an interest which gives it standing to sue under the parens patriae doctrine for injunctive relief from pollution in navigable waters which causes injury to fish. McCready v. Virginia, 94 U.S. 391, 394, 24 L.Ed. 248 (1877); Toomer v. Witsell, 334 U.S. 385, 399, 68 S.Ct. 1156, 92 L.Ed. 1460 (1948). Defendant *392 contends that the third count of the complaint under which the State sought recovery, on common law principles, of compensatory damages for the destruction of the fish, fails to state a claim upon which relief could be granted. During the trial, and on this appeal, it is defendant's contention that the State does not have a proprietary right to the fish in its waters sufficient to support an action for compensatory damages for the destruction thereof. The trial judge denied defendant's motion to dismiss, and we reject this argument on appeal.
The State argues that when fish are destroyed by pollution, thermal or otherwise, the State suffers both environmentally and economically. It argues that fish which are found in tidal waters such as Oyster Creek are tidal resources, and that tidal resources have long been recognized as subject to the public trust doctrine and the objects of special protection. See Arnold v. Mundy, 6 N.J.L. 1, 71 (Sup. Ct. 1821). In that old decision the State's fishery resource was said to be "in the hands of the sovereign power, to be held, protected, and regulated for the common use and benefit." Here, the trial judge found that the State had the right and the fiduciary duty to seek damages for the destruction of wild life which are part of the public trust:
The State has not only the right but also the affirmative fiduciary obligation to ensure that the rights of the public to a viable marine environment are protected, and to seek compensation for any diminution in that trust corpus. [125 N.J. Super. at 103]
We agree with the trial judge's conclusion and with his rejection of the artificial differences between the State's role as public trustee and its role under the fiction of parens patriae. In this bicentennial year it seems only proper that we reject confining concepts such as sovereign interests springing from the original 13 colonies. It seems to us that absent some special interest in some private citizen, it is questionable whether anyone but the State can be considered the proper party to sue for recovery of damages to the environment.
*393 The right of the State to sue under similar circumstances was upheld in the federal decisions in Dept. of N. Res. v. Amerada Hess Corp., 350 F. Supp. 1060, 1067 (D. Md. 1972), motion for relief den., 356 F. Supp. 975 (D. Md. 1973); Maine v. M/V Tamano, 357 F. Supp. 1097 (S.D. Me. 1973), mod. on other grounds, 373 F. Supp. 839 (S.D. Me. 1974). Cf. Dept. of Fish & Game v. S.S. Bournemouth, 307 F. Supp. 922 (C.D. Cal. 1969). Defendant seeks to distinguish the holding in Dept. of N. Res. v. Amerada Hess Corp., above, claiming that that court permitted the State of Maryland to maintain a common law action solely because the state had not enacted legislation upon which to base an action for relief from the owner and operator of a tanker who had discharged oil into the Baltimore harbor. In fact, the holding of the District Court is completely at variance with defendant's contention:
In upholding the State of Maryland's right to maintain the instant suit, this Court is not unmindful of the problems faced by the State of Maryland, and the other states of this country, as they engage in the daily battle to halt the pollution of their natural resources. For this Court to hold that unless a state has enacted legislation in the area of pollution control, it may not bring a common law suit to combat this problem, would be to unnecessarily tie the hands of the State in its war against pollution. * * * [350 F. Supp. at 1067]
The two decisions cited by defendant in its support, State v. Dickinson Cheese Company, 200 N.W.2d 59 (N.D. Sup. Ct. 1972), and Commonwealth v. Agway, Inc., 210 Pa. Super. 150, 232 A. 2d 69 (Super. Ct. 1967), we find to be distinguishable and not persuasive. The North Dakota case interpreted a statute of that state as not providing a right in the state to sue for damages. To the exent the Pennsylvania decision denied "propery right" in the Commonwealth  and the concurring opinion, dissenting from that proposition points out that this is not the primary ground for the decision  we disagree for the reasons set forth above.

*394 VII
The State has cross-appealed, claiming that the award of $935 as damages under the third count is inadequate. Our reading of the record satisfies us that the award made by the trial judge is the only one that could have been made under the proofs adduced by the State. While the measure of damages might have been the extent to which the quality of the environment had been diminished by the actions of defendant, the State's proofs fell far short of establishing such a basis. As defendant quite properly suggests, damages applying such a standard might well have been speculative. Accordingly, we find no merit to the State's cross-appeal.
The judgment of the Law Division under the first and third counts of the complaint is affirmed.
NOTES
[1] Both the south branch of the Forked River and Oyster Creek were subject to tidal flow prior to the construction of the Oyster Creek generating plant. As a result of defendant's pumping operations, both streams were made one-directional channels. The tides continued to rise and fall vertically in these waterways but did not ebb and flow.