[No. 3686–II. Division Two. December 10, 1980.]

THE DEPARTMENT OF FISHERIES, *Respondent,* v. CYRIL
O. GILLETTE, ET AL, *Appellants.*

*James R. Gregg,* for appellants.

*Slade Gorton, Attorney General,* and *Dennis D. Reynolds, Assistant,* for respondent.

REED, C.J.—Defendants Cyril and Sharon Gillette appeal a verdict and judgment awarding damages to the Washington State Department of Fisheries for loss of salmon caused when the Gillettes reconstructed the bank of a stream bordering their property. Defendants challenge the Department of Fisheries' capacity and standing to bring this action, the sufficiency of the evidence of damages, and the court's instructions on the measure of damages. They also raise several evidentiary questions. We hold the Department has both the capacity and standing to bring the action and has shown itself entitled to recover. We find no error in regard to the evidentiary issues and therefore affirm the judgment of the trial court.[1]

---

[1] We note a circumstance which makes our review of this case somewhat unique. The court reporter's stenotype machine malfunctioned for 2 of the 3 days

Defendants live on farm property bordering Cedar Creek, a salmon spawning stream in Clark County. Seasonal flooding of the creek left unwanted deposits of soil and gravel in Gillettes' adjoining pasture. In the spring of 1976, the flooding washed away so much of the bank that a utility pole was left dangling unsupported along the edge of the creek. Mr. Gillette appealed to the local Public Utility District for assistance in resetting the pole. Although PUD officials did not help, they evidently suggested the Gillettes reconstruct the bank themselves. Accordingly, one of Gillettes' employees, Ricky Smith, was directed to rebuild the bank. Gillette and the employee testified the reconstruction took place in September 1976. Smith testified that, using a caterpillar tractor with an attached blade, he drove back and forth through the stream and pushed material from the creek bed and the adjacent field onto the bank. The dike thus created rose as much as 20 feet above the creek.

RCW 75.20.100 provides that anyone wishing to construct a hydraulic project that will interfere with any river or stream bed must obtain written approval from both the Director of Fisheries and the Director of Game. The statute's purpose is to ensure that such projects include adequate protection for the fish life involved. Violation of the statute is a gross misdemeanor. Being unaware of the statute's requirements, the Gillettes did not obtain the necessary hydraulic project permit.

Representatives of both the Department of Game and the Department of Fisheries responded to reports of the construction and inspected the scene. The Department of

---

of the trial of this matter. The case thus comes to us largely on an agreed statement of facts analogous to the narrative report of proceedings provided for in RAP 9.3 and the agreed report of proceedings provided for in RAP 9.4. We have proceeded on the assumption that the statement of facts contains

> a fair and accurate statement of the occurrences in and evidence introduced in the trial court material to the issues on review

RAP 9.3, and

> only so many of the facts averred and proved or sought to be proved as are essential to the decision of the issues presented for review.

RAP 9.4.

Fisheries then filed this action in negligence for damages for the loss to the salmon fishery caused by the project.[2] At the close of the evidence, the court granted Fisheries a directed verdict on the issue of liability.[3] The jury thus considered only proximate cause and damage issues and awarded the State $3,150. Defendants appeal.

### CAPACITY AND STANDING

██ ██ In their threshold argument that the Department of Fisheries could not bring a civil action for damages to the State's fishery, defendants raise two issues of first impression in this state. We find no merit in defendants' first argument that the Department of Game should have been joined as a necessary party because the statute requires project approval from that Department as well as from the Department of Fisheries. Defendants cite no authority in support of this argument nor is it meritorious on its face. We therefore need not address it. *State v. Brewster,* 75 Wn.2d 137, 449 P.2d 685 (1969). Because the statute requires that each department must approve a proposed project, it follows that either could complain if its approval were not obtained and damage resulted to fish under its protection. The legislature has charged the Department of Game with protecting game fish, RCW Title 77, which does not include food fish such as salmon (which are under the jurisdiction of the Department of Fisheries). RCW 77.08.020, RCW 75.04.040, WAC 220–12–010. The Department of Game would have to show damage to fish under its protection, such as trout, before it could seek compensation on behalf of the State. *See Warth v. Seldin,* 422 U.S. 490, 499, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975). Finally, the people of the State of Washington are the real parties in interest to this action. Defendants may not use

---

[2]The Department of Fisheries dropped a connected claim for destruction of salmon spawning habitat because the creek rehabilitated itself.

[3]Gillettes do not challenge the trial court's ruling on liability.

the legislature's reasonable "division of labor" among executive departments to defeat this action on behalf of the people.

The second prong of defendants' argument opposing Department of Fisheries' standing raises a more significant question. Does the Department of Fisheries, or the State of Washington for that matter, have standing to bring a civil action for damage to fish, absent specific legislative authorization? Although no Washington cases have addressed this question, and other jurisdictions have divided on the issue,[4] we believe our statutes and court decisions provide the guidance necessary for its resolution.

██ First, the legislature has specifically charged the Department of Fisheries with the duty

> to preserve, protect, perpetuate and manage the food fish and shellfish in the waters of the state . . . [T]he department shall seek to maintain the economic well-being and stability of the commercial fishing industry in the state of Washington.

RCW 75.08.012. Our courts have long recognized the rule that

> when a statute contains a grant of authority to achieve a lawful objective there is included in the grant by implication the doing of such acts as are reasonably necessary to properly attain such objective.

*State v. Melton,* 41 Wn.2d 298, 300, 248 P.2d 892 (1952); *accord, State ex rel. Hunter v. Superior Court,* 34 Wn.2d 214, 208 P.2d 866 (1949); *State ex rel. Becker v. Wiley,* 16 Wn.2d 340, 133 P.2d 507 (1943); *Pacific County v. Sherwood Pac., Inc.,* 17 Wn. App. 790, 567 P.2d 642 (1977).[5] There is no question that the hydraulics act furthers the lawful objectives outlined in RCW 75.08.012. Nor does it seem unreasonable for the Department to protect the fish in its charge through a damage action when individuals have caused a loss to the fishery.

---

[4]See cases cited at footnote 6, *infra.*

[5]*Cf. Warth V. Seldin,* 422 U.S. 490, 45 L. Ed. 2d 343, 95 S. Ct. 2197 (1975).

Second, the State's proprietary interest in animals ferae naturae dates at least from the common law of England. *See* 2 W. Blackstone, *Commentaries* \*403 (1803). Our courts have incorporated this concept in cases upholding the State's authority to regulate fish and game. *Department of Fisheries v. Chelan County PUD 1,* 91 Wn.2d 378, 588 P.2d 1146 (1979) and cases cited therein. Washington courts have emphasized that the food fish of the state are the sole property of the people and that the State, acting for the people, is dealing with its own property, "over which its control is as absolute as that of any other owner over his property". *State ex rel. Bacich v. Huse,* 187 Wash. 75, 79, 59 P.2d 1101 (1936). *See, e.g., Judd v. Bernard,* 49 Wn.2d 619, 304 P.2d 1046 (1956); *accord, State ex rel. Campbell v. Case,* 182 Wash. 334, 47 P.2d 24 (1935). *See also, State v. Cramer,* 167 Wash. 159, 164, 8 P.2d 1004 (1932) ("The fish were the property of [the State] until such time as they were lawfully reduced to possession [of individual]"). In addition to recognizing the State's proprietary interest in its fish, our courts have also held that the State holds its title as trustee for the common good. *State ex rel. Bacich v. Huse, supra.*

In bringing this action, the Department of Fisheries specifically relied on its capacity as trustee and its responsibilities under RCW Title 75 to protect the State's fisheries. Violation of a statute is negligence per se and an individual in the class protected by the statute has a cause of action for damages proximately caused by the violation. *Currie v. Union Oil Co.,* 49 Wn.2d 898, 901, 307 P.2d 1056 (1957); *Engelker v. Seattle Elec. Co.,* 50 Wash. 196, 96 P. 1039 (1908). Defendants admit they violated RCW 75.20.100, which is designed to protect society's interest in preserving the fishery and fish habitat. Representing the people of the State—the owners of the property destroyed by violation of the statute—the Department of Fisheries thus has a right of action for damages. In addition, the State, through the Department, has the fiduciary obligation of any trustee to seek damages for injury to the object of its trust. We note

in passing that if the State were denied a right of recovery for the damage which the jury found this construction did to the State's fishery, no one would have standing to recover for the injury. *Department of Environmental Protection v. Jersey Cent. Power & Light Co.*, 133 N.J. Super. 375, 336 A.2d 750, 759 (1975), *rev'd on other grounds,* 69 N.J. 102, 351 A.2d 337 (1976) (questionable whether, absent special interest, anyone but State is proper party to sue for damages to environment); 35 Am. Jur. 2d *Fish and Game* § 22 (1967). We therefore hold that where the violation of a statute designed to protect the State's property causes injury to that property, the State or a responsible executive agency of the State has standing to seek compensation for the injury.[6]

## DAMAGE ARGUMENTS

Addressing defendants' damage arguments, we turn first to their challenge to the sufficiency of the evidence that their activities caused any damage to fish at all. Defendants argue that the only way to show damage would be to compare the actual number of salmon hatched in Cedar Creek in years prior to the construction work with the actual number hatched in 1976. Defendants present no authority in support of this argument and we therefore need not consider it. *Roberts v. Atlantic Richfield Co.*, 88 Wn.2d 887, 568 P.2d 764 (1977). We note, however, that our courts consider circumstantial evidence to be as competent as direct evidence. *State v. Gosby*, 85 Wn.2d 758, 539 P.2d 680 (1975).

From the record, we glean the following summary of testimony which the jury was entitled to believe. Prior to the construction, the stream bed at the site was "one of the

---

[6]*See also Department of Environmental Protection v. Jersey Cent. Power & Light Co.*, 133 N.J. Super. 375, 336 A.2d 750 (1975), *rev'd on other grounds,* 69 N.J. 102, 351 A.2d 337 (1976); *State v. Bowling Green*, 38 Ohio St. 2d 281, 313 N.E.2d 409 (1974). *Contra, State v. Dickinson Cheese Co.*, 200 N.W.2d 59 (N.D. 1972); *Commonwealth v. Agway, Inc.*, 210 Pa. Super. Ct. 150, 232 A.2d 69 (1967). *See generally* Annot., 42 A.L.R. Fed. 23 (1979).

better spawning areas." Salmon spawning peaks in late October. There was no sign of construction as late as October 15. On October 25, fishermen noticed muddy water downstream from the site. The next day they visited the site and saw carcasses and dried salmon eggs in fresh tractor tracks on the Gillette bank. They also saw salmon trying to spawn in the area. The stream bottom appeared mushy and lacked the gravel necessary for nesting sites. Based on the number of salmon redds (nests) in the half–mile below the construction site, there should have been 30 redds in the affected area. Fisheries Department specialists saw no redds at all on December 1. The Department's expert witnesses concluded spawning had probably occurred in the area. Core samples taken in January indicated the stream bed had a percentage of fine materials significantly higher than would permit incubating salmon to survive. If salmon had spawned in the area before construction, most of the nests would have been destroyed. Any remaining eggs would have a poor chance of surviving. Spawning attempted after construction would have been unsuccessful because of the lack of gravel and the high percentage of silt. Fry counts in the spring of 1977 showed virtually no fry in the construction area, the counts being the second lowest of any stream in Southwest Washington. Thus, even accepting Gillettes' contention that the construction occurred in September, the jury had before it sufficient circumstantial evidence from which it could find actual damage. A reviewing court will not disturb a jury verdict supported by substantial evidence. *Hernandez v. Western Farmers Ass'n,* 76 Wn.2d 422, 425, 456 P.2d 1020 (1969).

Defendants next challenge the trial court's adoption in its instructions of the measure of damages theory presented by the Department of Fisheries. The only evidence regarding the value of the fish lost derived from the testimony of Donald McIsaac, a biostatistician and fish production specialist from the Department of Fisheries. Working from the testimony of other witnesses as to the number of nests

which should have been in the construction area, Mr. McIsaac referred to studies showing number of eggs per nest and survival rates to predict the number of fish which would have survived to be caught. He concluded that the State's fishery lost 606 adult fish as a result of defendants' construction project.

According to his testimony, as summarized in the statement of facts, the value of these fish was

> basically the market value of the fish, which was the net economic value of the salmon to the public fishery. [H]e defined net economic value . . . as essentially the amount of value or profits society made from the catch of the fish.

For the sports fishery, this figure was derived from a 1976 study adjusted for inflation and included the amount people would spend for the opportunity to catch fish.[7] For the commercial fishery, Mr. McIsaac multiplied the ex–vessel price paid by a commercial processor by a factor of 2.1 to "reflect additional value to society for wages and income generated by further processing of fish."[8] Under this theory, the value of the destroyed fish was $9,431.78. On cross–examination, Mr. McIsaac admitted the ex–vessel price for all the fish would be $3,859.10. As indicated, the jury's award was $3,150.

 Defendants challenge this measure of damages as too remote and speculative to provide a basis for recovery.

---

[7]Although the record does not so indicate, we assume this study is S. Mathews & G. Brown, *Economic Evaluation of the 1967 Sport Salmon Fisheries of Washington,* Washington Department of Fisheries Technical Report No. 2 (April 1970).

[8]Again, the record does not indicate the source of this multiplier. The Department's counsel at oral argument indicated it was developed by the University of Washington and is generally accepted. While we do not pass on the validity of using this particular multiplier, we note multipliers are used in studies in this field. *See, e.g.,* J. Crutchfield, *Washington Baseline Study Marine Economic Component,* Final Report, Institute for Marine Studies, University of Washington (1975), and J. Crutchfield & D. MacFarlane, *Economic Valuation of the 1965–66 Salt–water Fisheries of Washington,* Department of Fisheries Research Bulletin No. 8 (Dec. 1968).

Defendants, however, do not challenge the technical validity of the basis of Mr. McIsaac's valuation theory. Nor did they present evidence other than Mr. McIsaac's cross–examination testimony as to any other theory for measuring damages to society. This court declines to assess the technical validity of a theory which was presented by expert testimony, a matter generally within the trial court's discretion. *See Myers v. Harter,* 76 Wn.2d 772, 459 P.2d 25 (1969). In any event, we are reluctant to immunize a defendant once damage has been shown merely because "the extent or amount thereof cannot be ascertained with mathematical precision, provided the evidence is sufficient to afford a reasonable basis for estimating loss." *Jacqueline's Wash., Inc. v. Mercantile Stores Co.,* 80 Wn.2d 784, 786, 498 P.2d 870 (1972); *accord, Lundgren v. Whitney's, Inc.,* 94 Wn.2d 91, 614 P.2d 1272 (1980). Here, defendants do not deny their activity disrupted the bed of a salmon spawning stream. The Department presented ample evidence to justify a finding that damage did occur as a result of defendants' project. On this record, we believe Mr. McIsaac's testimony on direct and cross–examination provided the jury with the requisite reasonable basis for estimating the loss.

EVIDENCE QUESTIONS

■ Defendants also raise several evidentiary issues. They first contend the court erroneously permitted Mr. McIsaac to base his opinions in part on the published studies of other experts. As defense counsel noted at argument, this issue will not arise in cases tried after April 2, 1979, the effective date of our new Rules of Evidence. Under ER 703, experts may base their opinions on hearsay if "of a type reasonably relied upon by experts in the particular field". The Judicial Council Task Force comment on ER 703 indicates the rule "reflects the approach taken in the more recent cases." 91 Wn.2d 1159 (1979). *State v. Wineberg,* 74 Wn.2d 372, 384, 444 P.2d 787 (1968) held that

when an expert is allowed to testify to a valuation opinion which is in part based on facts which would normally be hearsay and inadmissible as independent evidence, the trial court may in its discretion allow the expert to state such facts for the purpose of showing the basis of the opinion.

Here the witness identified the factors he considered in developing his opinion: testimony of others (permissible under prior law), *see Potter v. Van Waters & Rogers, Inc.,* 19 Wn. App. 746, 578 P.2d 859 (1978), certain studies at issue here, and his own survey of fry survival the following spring. Nor does the record reflect that the witness adopted the conclusions of other experts as his own. Admission of expert testimony rests within the sound discretion of the trial court. *Crowe v. Prinzing,* 77 Wn.2d 895, 897, 468 P.2d 450 (1970). We find no abuse of the court's discretion on this record.

Defendants next contend the court erred in excluding photographs of Cedar Creek at flood stage. They argue that because the court admitted the State's photographs taken prior to construction and those taken by the local wildlife agent when he inspected the scene after construction, the jury should also have had the opportunity to see their photographs. As defendants recognize, admission of photographs is a matter of discretion for the trial court, whose ruling a reviewing court will not disturb absent abuse. *State v. Boggs,* 33 Wn.2d 921, 924–25, 207 P.2d 743 (1949). Although photographs which accurately represent physical conditions are admissible, they must be relevant, that is, they must relate to some matter properly provable in the case. *Mason v. Bon Marche Corp.,* 64 Wn.2d 177, 178, 390 P.2d 997 (1964); 5 R. Meisenholder, Wash. Prac. § 32, at 53 (1965). *See also* Notes of Advisory Committee on Proposed Rules, Fed. R. Evid. 401.

The photographs offered by defendants were taken at a considerable distance from the stream. Unlike the "before and after" pictures admitted in the Department's case, the defendants' photographs do not tend to prove or disprove

any fact relating to the defendants' negligence or the effect of the construction on the fishery. The trial judge correctly excluded defendants' photographs.

Defendants finally contend the trial court erroneously admitted a chart used to illustrate Mr. McIsaac's testimony. The statement of facts does not mention the exhibit, nor does the record before us include it. We cannot therefore evaluate defendants' contention that Mr. McIsaac represented that the data included in the exhibit was accurate. We are satisfied, however, that the exhibit was used properly. Both sides acknowledge the exhibit was admitted for illustrative purposes only. Defendants do not contradict the Department's assertion that the court instructed the jury on the exhibit's limited purpose. In any event, use of such charts is generally permitted at the court's discretion to illustrate expert testimony. R. Meisenholder, *supra* § 32, at 59.

Affirmed.

PEARSON and PETRICH, JJ., concur.