Nicholas BACHYNSKY, M.D., Physicians' Clinic of Dallas, Inc., Physicians' Clinic—Arena, Inc., Physicians' Clinic—FM 1960 Area, Inc., Physicians' Clinic—Town & Country, Inc., and Physicians' Clinic—San Antonio, Inc., Appellants,

v.

The STATE of Texas, Appellee.

No. 05–86–00699–CV.

Court of Appeals of Texas, Dallas.

March 3, 1988.

Rehearing Denied April 5, 1988.

John R. Mercy, Jeffrey C. Elliott, Louise E. Tauson, Texarkana, for appellants.

Stephen Gardner, Eliot D. Shavin, Craig Jordan, Dallas, for appellee.

Before HOWELL, STEWART and HECHT, JJ.

HECHT, Justice.

The State of Texas sued Dr. Nicholas Bachynsky and five related weight-loss clinics (collectively "Bachynsky"). The gravamen of the State's allegations is that Bachynsky used the drug Dinitrophenol ("DNP") in his weight-loss programs even though it is a toxic herbicide never approved by the United States Food and Drug Administration as safe for human consumption. The State alleges violations of the Texas Deceptive Trade Practices—Consumer Protection Act[1] and the Texas Food, Drug and Cosmetics Act.[2] The State also alleges that Bachynsky was negligent in prescribing DNP for his patients. The jury found in favor of the State on all three theories and assessed statutory civil penalties against Bachynsky, which the district court awarded in its judgment. The district court also granted the State injunctive relief, attorney's fees and costs.

We hold that the State cannot assert a *parens patriae* cause of action for negligence, at least in the context of this case, and that presentation of this claim probably confused and misled the jury. Accordingly, we reverse the judgment of the district court and remand the case for further proceedings. We further hold that the district court erred in admitting, over Bachynsky's objection, certain irrelevant and unfairly prejudicial evidence.[3]

## I

A state may sue *parens patriae*, as "parent of the country", to protect a quasi-sovereign interest, including an "interest in the health and well-being—both physical and economic—of its residents in general." *Alfred L. Snapp & Son, Inc. v. Puerto Rico*, 458 U.S. 592, 102 S.Ct. 3260, 73 L.Ed. 2d 995 (1982). As the cases cited in *Snapp* reflect, various causes of action may be asserted *parens patriae*—environmental pollution, public nuisance, trade barriers,

1. Tex.Bus. & Comm.Code Ann. §§ 17.41–17.63 (Vernon Supp.1987) ("DTPA"). The Attorney General, acting on behalf of the consumer protection division of his office, and suing in the name of the State, apparently alleges violations of § 17.46(b)(5), (23), pleading that Bachynsky represented "that goods or services have characteristics, uses, or benefits which they do not have", and failed "to disclose information concerning goods or services which was known at the time of the transaction where such failure to disclose such information was intended to induce the consumer into a transaction into which the consumer would not have entered had the information been disclosed".

2. Tex.Rev.Civ.Stat.Ann. art. 4476–5 (Vernon Supp.1987). The Attorney General brought suit at the request and as an authorized agent of the Texas Commissioner of Health, under section 4 of the Act.

3. We sustain appellants' points of error two and three, which assert error in submitting the State's negligence theory to the jury and rendering judgment on the theory. We address but do not rule upon appellants' point of error four, which asserts error in the admission of evidence of Barker's suicide. We address in note 9, *infra*, point of error one, which asserts error in allowing the Attorney General to maintain this action. We need not and do not address the remainder of appellants' 31 points of error.

antitrust violations, employment discrimination—but the nature of the relief sought is almost always the same: injunctive or equitable. This is true of *Snapp* and all the examples it cites, as well as all the cases from our own jurisdiction cited by the State in its brief.[4] *Parens patriae* actions for damages have been allowed in only a few cases involving claims for pollution cleanup and destruction of natural resources,[5] and occasionally small overcharges against the entire populace of the state [6] and restitution for consumer fraud.[7]

The injunctive relief the State seeks in the present case is typical of *parens patriae* cases. Although the State's pleadings do claim damages and restitution on behalf of any of its citizens injured by Bachynsky's acts, the State abandoned all damage claims by not requesting a jury finding or judgment on them.[8] The State argues that its negligence cause of action entitles it, not to money damages, but to the same injunctive relief claim by its statutory actions:

In addition to the standing conferred by the DTPA and the Food and Drug Act to halt appellants' illegal practices, the State has *parens patriae* standing to seek an injunction prohibiting the appellants from engaging in what amounts to assembly-line malpractice.

 Proving negligence would not entitle the State to the injunctive relief it seeks. Only in a most extraordinary situation—and we know of no reported decision involving one—could entitlement to injunctive relief be premised upon a finding of negligence. The reason is that equity need not intervene in negligence actions in which full relief is afforded by law through damages. The State in this case, fully authorized to obtain all the relief it seeks by the statutes it claims Bachynsky violated, cannot have redress against Bachynsky upon any claim of negligence.[9]

Nevertheless, the district court allowed the State to offer proof that Bachynsky

4. *Yett v. Cook,* 115 Tex. 205, 281 S.W. 837, 842 (1926) (dicta: "State may maintain an action to prevent an abuse of power by public officers, and in general protect the interest of the people at large in matters in which they cannot act for themselves"); *Goldsmith & Powell v. State,* 159 S.W.2d 534 (Tex.Civ.App.—Dallas 1942, writ ref'd) (suit to enjoin pollution of river by salt water from oil wells); *Allred v. Beggs,* 125 Tex. 584, 84 S.W.2d 223 (1935) (action for injunction and receiver to conserve assets of charitable trust); *Powers v. First Nat'l Bank,* 138 Tex. 604, 161 S.W.2d 273 (1942) (dicta: State may sue to protect charitable trust).

5. *See Maine v. M/V Tamano,* 357 F.Supp. 1097 (D.Me.1973) (damages for death of marine life from oil spill); *Maryland Dep't of Natural Resources v. Amerada Hess Corp.,* 350 F.Supp. 1060, 1065–1067 (D.Md.1972) (damages for pollution of harbor from oil spill); *Puerto Rico v. SS Zoe Colocotroni,* 456 F.Supp. 1327, 1337 (D.P. R.1978), *aff'd,* 628 F.2d 652 (1st Cir.1980), *cert. denied,* 450 U.S. 912, 101 S.Ct. 1350, 67 L.Ed.2d 336 (1981) (damages from oil spill); *In re Oswego Barge Corp.,* 439 F.Supp. 312, 321–322 (N.D. N.Y.1977) (damages for oil spill cleanup); *New Jersey Dep't of Environmental Protection v. Jersey Cent. Power & Light Co.,* 133 N.J.Super. 375, 336 A.2d 750, 758–759 (1975), *rev'd on other grounds,* 69 N.J. 102, 351 A.2d 337 (1976) (damages for death of fish in stream caused by sudden discharge of cold water from nuclear power plant); *Ohio v. City of Bowling Green,* 38 Ohio St.2d 281, 313 N.E.2d 409 (1974) (damages for

death of fish from pollution of river with sewage); *see also* Annotation, *State's Standing to Sue on Behalf of Its Citizens,* 42 A.L.R.Fed. 23 (1979).

6. *Minnesota v. Standard Oil Co.,* 568 F.Supp. 556, 563–566 (D.Minn.1983).

7. *See* Annotation, *Right of State, Public Official, or Governmental Entity to Seek, or Power of Court to Allow, Restitution of Fruits of Consumer Fraud, Without Specific Statutory Authorization,* 55 A.L.R.3d 198 (1974).

8. Its decision was well-advised, because any monetary recovery in this case would follow not from a general injury to the people of Texas but to specific injuries to Bachynsky's patients. Such damages would necessarily be subjective, depending upon the particular person involved.

9. The parties argue much about whether the Attorney General is empowered to "assert a negligence action", an issue raised by Bachynsky in point of error one. The Attorney General is not asserting any cause of action in this case, negligence or otherwise. He is only representing the State of Texas in its causes of action, which he is fully authorized to do. Tex. Const. art. 4, § 22. The issue is not the Attorney General's right to represent the State, but the State's right to sue *parens patriae* for negligence. Bachynsky's point of error one is overruled.

was negligent, including manner of treatment, dosages prescribed, and reactions of patients. Little if any of this evidence would have been admissible under either of the State's other two causes of action. For the State to use a negligence claim to cast this case not only a dangerous drug and consumer fraud case but also a malpractice case, accusing Bachynsky of wrongs for which it could not recover, was highly prejudicial.

The district court submitted issues to the jury inquiring whether any negligence of Bachynsky in using DNP proximately caused injury to his patients. The jury answered affirmatively. Because the State had no cause of action for negligence, the district court erred in submitting these issues to the jury, and that error harmed Bachynsky.

> The improper submission of issues constitutes reversible error when harm is suffered by the complaining party. Whether harm has been suffered may be considered in light of the charge as a whole.... Generally, error in the submission of an issue is harmless when the findings of the jury in answer to other issues are sufficient to support the judgment.... An exception exists, however, when the erroneously submitted issue confuses or misleads the jury....

*Boatland of Houston, Inc. v. Bailey*, 609 S.W.2d 743, 749–750 (Tex.1980). The State confused and misled the jury into thinking that this case was one of malpractice. The judgment against Bachynsky must therefore be reversed.

## II

■ In an advertising brochure, Bachynsky claimed that "there have been no fatalities associated with Mitcal™ [i.e., DNP]." To prove this statement false, the State offered the testimony of Dr. Charles S. Petty that an autopsy on one David Barker established that he had died from an intentional overdose of DNP. The drug had been prescribed for him by Bachynsky. The State also offered a photograph of Barker's corpse taken during the autopsy, ostensibly to show yellow stains on his hands indicating that he had handled DNP shortly before his death.

The relevance of this proof, the State argues, is to show that Bachynsky misrepresented that DNP is a safe and appropriate drug for use in a weight-loss program in violation of the DTPA. Admittedly, Bachynsky's brochure does represent that DNP is a safe and appropriate drug for use in a weight-loss program. The brochure explains:

> *Are There Any Side Effects?*
> We only prescribe Mitcal™ for those patients that have tried "everything" but can't seem to lose weight. You cannot take it if you are pregnant or have had a recent heart attack. The side effect is increased body heat. When your body starts burning off those excess calories, it gives off heat, and you may perspire more often. There have been no fatalities associated with Mitcal™.

Barker's suicide proves the last sentence quoted false, but it says nothing about whether DNP is a safe and appropriate drug for use in a weight-loss program. The issue is not whether Bachynsky made a false statement but whether he misrepresented the characteristics of DNP. Barker did not die from a prescribed use of DNP, but from a deliberate overdose. He might as well have used aspirin. The fact that a drug can be abused is irrelevant to whether it can be used safely as prescribed. Consequently, evidence of Barker's suicide is irrelevant and inadmissible.

Furthermore, the evidence was highly prejudicial. The State's motive, veiled as but with gossamer, was to shock the jury into the conviction that DNP is a killer drug and to prejudice them against Bachynsky. Admission of this evidence was error. Nevertheless, we must hold the error harmless unless we can determine whether evidence of Barker's suicide "was reasonably calculated to cause and probably did cause rendition of an improper judg-

ment."[10] The question is a close one. The trial of this case consumed two weeks. The miasma of evidence even as prejudicial as that erroneously admitted in this case tends to be diluted by the sheer volume of evidence in a long trial, making it all the more difficult for an appellate court to judge the impact of that evidence alone upon the jury. Although we are inclined to conclude that the error of admitting evidence of Barker's suicide probably did cause the jury to render an improper verdict, we need not do so in view of our holding above. Having concluded Bachynsky's points of error two and three should be sustained and the case reversed and remanded, we do not rule upon Bachynsky's point of error four.

HOWELL, Justice, concurring and dissenting.

I concur in the judgment only; I dissent from the veiled holding that, on re-trial the State may not introduce any evidence at all concerning the death of David Barker.

Photographs of corpses are, to many persons, gruesome, shocking and revolting. They are by their very nature highly inflammatory to a jury of laymen. For that reason, the rule has been established in wrongful death actions that such photographs are inadmissible unless necessary to establish a disputed fact issue. Where the trial court admits pictures of corpses without a showing of particularized need, reversal has been ordered. *St. Lukes Hospital Assn. v. Long,* 125 Colo. 25, 240 P.2d 917, 922, 31 A.L.R.2d 1120, 1127 (1952) (hospital malpractice action, child allegedly strangled when his head passed through bed rails; held, although photo of head showing a mark on cheek would have been admissible, photo of entire body including autopsy incision and sutures was improperly admitted); *Ryan v. United Parcel Service,* 205 F.2d 362, 364 (2d Cir.1953) (wrongful death action; held, error to admit collision scene photo showing decedent's body hanging out of car door).

There are no Texas cases on the admissibility, in a civil action, of a photo of a corpse, but the Texas rule has been foretold by *Heddin v. Delhi Gas Pipeline Co.,* 522 S.W.2d 886 (Tex.1975) (gas pipeline condemnation case, landowner offered photos of rupture of another pipeline in area as evidence of devaluation on account of public fear of high pressure gas mains; admission held erroneous):

> Over strenuous objections, a number of photographs of the carcasses of the cattle and the pets belonging to the landowner in the Pan American case were introduced. Although photographic reproductions can be beneficial to all parties in the trial of a lawsuit, those that are merely calculated to arouse the sympathy, prejudice or passion of the jury and do not serve to illustrate disputed issues or aid the jury in its understanding of the case should not be admitted.... The photographs of the dead animals ... had no relevance to the disputed issues; they were not calculated to aid the jury in its understanding of the case. Indeed, it must be concluded that they were shown not for the purpose of establishing the dangerousness of the pipeline but rather for their shock value.... Admission of these highly inflammatory and irrelevant photographs was such error as was reasonably calculated to cause and probably did cause the rendition of an improper judgment.

*Id.* at 889–90. (citations omitted).

There is no reason to hold otherwise in the case at hand. The photos of the corpse of David Barker proved nothing that was not already conceded. His death was a suicide; the means by which he took his life was through a massive overdose of the drug Mitcal which was the centerpiece of appellant's weight-loss program. If the fact that Barker's dead hands showed yellow stains was still significant in view of appellant's direct admissions—a doubtful premise—the pathologist could easily have testified about the stains. It follows that

10. Tex.R.App.P. 81(b)(1).

pictures of the Barker corpse were of little or no utility to the State except for the purpose of inflaming the jury, a blatant appeal to prejudice.

The judgment of remand is eminently correct. The writer does not disagree with the grounds upon which the majority relies for reversal. However, the majority should further hold that the admission of the photo of the Barker corpse in evidence was also reversible error—harmful reversible error.

The majority has cryptically attempted to telegraph to the trial court an instruction that, upon re-trial no evidence whatever may be admitted pertaining to Barker's death. The writer cannot accept that such instruction is correct.

The majority quotes from appellant's weight-loss brochure the unqualified statement that "[t]here have been no fatalities associated with Mitcal." (at 871). The majority proceeds to hold that Barker's suicide proves the statement to have been false. The majority concludes that evidence of the Barker suicide was "irrelevant and inadmissible" because Barker could conceivably have committed suicide using aspirin. The holding is a non-sequitur.

We are dealing with promotional literature-advertising material. The suit was brought under the Deceptive Trade Practices Act prohibiting "false, deceptive or misleading conduct." Tex.Bus. & Comm.Code § 17.46(a) (Vernon 1987). Sales promotion literature such as this is always thoughtfully worded and carefully crafted. The admittedly false statement could have been made true by causing it to read "[t]here have been no fatalities associated with Mitcal *when used in recommended dosages.*"

Upon re-trial, the trier of fact could legitimately conclude that appellant deliberately, as a matter of choice, omitted the emphasized language; that appellant deliberately employed a half-truth being desirous not to raise the reader's concern with what happens when recommended dosages are exceeded. It could conclude that appel-

lant's action in inserting this half-truth in the brochure was false, deceptive or misleading conduct. On the other hand, the trier of fact could well conclude, as our majority has concluded, that "evidence of Barker's suicide is irrelevant."

The fatal flaw in the majority reasoning is its failure to distinguish between the function of the judge and the function of the jury. In short, the jury should be allowed to know that appellant's weight-loss brochure was something less than frank, factual and literally true. From that point forward, it should be the prerogative of the jury, as the finder of fact, not the court as the giver of the law, to decide the significance of appellant's digression from the complete truth.

I dissent from any attempt to instruct the trial court that, upon re-trial, evidence relating to the cause of Barker's death shall not be admitted.