675 F.2d 1218
 SWISH MANUFACTURING SOUTHEAST, d/b/a Swish Manufacturing
Company and Pine Mountain Air Charter, Plaintiffs-Appellees,
v.
The MANHATTAN FIRE & MARINE INSURANCE COMPANY and/or Puritan
Insurance Company; and Southern Marine & Aviation
Underwriters, Inc., Defendants-Appellants.
 No. 81-7328.
 United States Court of Appeals,
Eleventh Circuit.
 May 13, 1982.
 
 1
 Swift, Currie, McGhee & Hiers, Glover McGhee, Michael H. Schroder, Atlanta, Ga., for defendants-appellants.
 
 
 2
 Thompson, Stovall, Stokes & Thompson, Fletcher Thompson, Atlanta, Ga., for plaintiffs-appellees.
 
 
 3
 Appeal from the United States District Court for the Northern District of Georgia.
 
 
 4
 Before RONEY and KRAVITCH, Circuit Judges, and PITTMAN*, District Judge.
 
 PITTMAN, District Judge:
 
 5
 This is an appeal from the district court's granting of the appellees' motion for partial summary judgment on the issue of liability arising under a contract of insurance. The appellants allege several grounds as error. Because we find the issue concerning conversion to be dispositive of the question of coverage, we pretermit discussion of these alternate grounds.
 
 
 6
 Swish Manufacturing Southeast, Inc. (Swish) is the owner of the 1970 Mitsubishi MU-2G aircraft involved in this litigation. Swish's base of operation is in Pine Mountain, Georgia, and the aircraft is used to transport company sales personnel. The appellant, The Manhattan Fire & Marine Insurance Company, now called Puritan Insurance Company (Puritan), issued a policy of insurance to Swish covering the aircraft for the term of January 6, 1976, to October 17, 1976. The policy limits were for the agreed hull value of $350,000.00.
 
 
 7
 In the summer of 1976, William Aylin, President of Wings, Inc. (Wings), approached officers of Swish with a proposal to lease the aircraft. An agreement was negotiated wherein Wings took possession of the plane and maintained the aircraft at its Tallahassee, Florida headquarters. The lease permitted Wings to use the plane whenever it wished, without any prior notice to Swish, so long as Swish had not made prior arrangements to use the plane at that time. Wings used the plane to transport passengers for hire, paying Swish $215.00 per hour of flight time. The lease contract precluded Wings from transporting cargo or using the aircraft for unlawful purposes.
 
 
 8
 Puritan, at the request of Swish, issued an endorsement to the insurance policy providing liability coverage for Wings and waiving its subrogation rights against Wings for any damages caused by Wings.
 
 
 9
 On October 14, 1976, Aylin piloted the aircraft to the Bahamas for the purpose of smuggling marijuana into this country. The plane was seized by Bahamian police at the Stella Maris Airport with its cargo of contraband on board. While in Bahamian control, the plane was damaged and certain electronic equipment removed.
 
 
 10
 Swish, in learning of these events and the whereabouts of its property, made a timely demand on Puritan for payment of the loss. Puritan formally rejected the claim, taking the position, inter alia, that coverage was excused under the exclusion provision of sub-paragraph 11 providing that the policy does not apply and no coverage is afforded:
 
 
 11
 11. To loss or damage due to conversion, embezzlement or secretion by any person in possession of the aircraft under a bailment, lease, conditional sale, purchase agreement, mortgage or other encumbrance, nor for any loss or damage during or resulting therefrom. (Emphasis supplied.)
 
 
 12
 Appellee then proceeded to take its own measures to effect the return of its aircraft which included payment of a substantial fine and for repairs to the plane.
 
 
 13
 Aylin (Wing's president), testified that he did not steal the aircraft, but was voluntarily given possession and at all times intended to return it when his trip was completed. It is undisputed that neither Swish nor any of its agents knew or had reason to know of Aylin's unlawful use of its aircraft.
 
 
 14
 With reference to the exclusion in sub-paragraph 11, the dispositive issue is whether, under Georgia law, there was a "conversion" of appellee's aircraft. For reasons which hereinafter follow, the court is convinced that these facts support a legal conclusion of conversion and therefore the district court erred in ruling, as a matter of law, that this policy exclusion was inapplicable.
 
 
 15
 The district court properly reasoned that, since Wings held the aircraft under a lease agreement, the exclusion would apply if it were shown that Wings, through its agent Aylin, "converted" the plane. Under Georgia law a conversion is "the unauthorized assumption and exercise of the right of ownership over personal property belonging to another which is contrary to the owner's right." Shaw v. Wheat Street Baptist Church, 141 Ga.App. 883, 234 S.E.2d 711, 713 (1977). The common law is clear that misuse, that is, use beyond that which the owner consented to, may give rise to conversion. 18 Am.Jur.2d Conversion § 48 (1965). In such instances, the extent of the deviation determines whether an action for trover and conversion will lie. Prosser, Handbook for the Law of Torts, § 15, at 92-93 (1971).
 
 
 16
 The Restatement (Second) of Torts §§ 222A-242 (1965) provide detailed definitions and illustrations of acts which constitute conversion. In particular, § 228 is quite helpful to the facts of the case sub judice.
 
 
 17
 § 228. EXCEEDING AUTHORIZED USE
 
 
 18
 One who is authorized to make a particular use of a chattel, and uses it in a manner exceeding the authorization, is subject to liability for conversion to another whose right to control the use of the chattel is thereby seriously violated.
 
 
 19
 The illustrations provided in the Restatement indicate that where one entrusts an automobile to another for the purpose of selling it, and the agent uses the vehicle for transportation of contraband, as a result of which it is confiscated by the authorities, a conversion has occurred. Id. at § 222A, Illustration 23, at 435. Accord, Vermont Acceptance Corp. v. Wiltshire, 103 Vt. 219, 153 A. 199 (1931).
 
 
 20
 While it is not clear whether the Georgia courts have expressly adopted the Restatement approach, certain cases reflect the adoption of principles which parallel the logic and result of the Restatement examples. In Mundorff v. Compass Travel, Inc., 144 Ga.App. 120, 240 S.E.2d 321 (1977), the court upheld a finding of conversion by the secretary-treasurer of a corporation who was authorized to pay out funds and paid a sum to himself as collateral for a prior intra-corporate loan. See also Pelletier v. Schultz, 157 Ga.App. 64, 276 S.E.2d 118 (1981). Again, the court recognized a conversion where the owner of an automobile left his car with a dealer for the purpose of having it repaired and the dealer used the car as a demonstrator and wrecked it. Strother Ford, Inc. v. Bullock, 142 Ga.App. 843, 237 S.E.2d 208 (1977). Even prior to the promulgation of the Restatement, Georgia courts followed the common law principle that unauthorized use which results in damage to a chattel constitutes a conversion. Farkas v. Powell, 86 Ga. 800, 13 S.E. 200 (1891).
 
 
 21
 In an even closer fact situation to the one presently facing this court, an automobile owner permitted the use of his car to a second party for the express purpose of driving from Point A to Point B. This the borrower did, but after returning to Point A he set out on an unauthorized trip to Point C. While on the unauthorized excursion, the car was involved in an accident and third parties injured.
 
 
 22
 The owner was covered by a liability insurance policy containing an "omnibus" clause which extended coverage to any person using the insured's vehicle provided that the actual use of the car was with the permission of the named insured. It appears that the "permission" requirement serves a purpose strikingly similar to the conversion exclusion herein.
 
 
 23
 The issue was one of first impression to the Georgia courts and in analyzing the two differing approaches taken by other jurisdictions, the court said:
 
 
 24
 The only difference of opinion to be found in construing the term is whether the permission is confined to the time when the accident occurred or whether it is defined as permission 'in the first instance,' that is to say, permission to get possession of the car at the beginning of its operation is such permission as would render the insured liable even though at the time of the accident, the operator of the car might have been expressly prohibited to use the car, or the operator may have been using it for a purpose wholly prohibited by the named insured.
 
 
 25
 Whatever may be the rule in the majority of the jurisdictions, we hold that while slight and inconsequential deviations will not annul the coverage of the omnibus clause, yet there is an absence of 'permission,' within the meaning of the policy, if the car is being driven at a time or place or for a purpose not authorized by the insured. In other words, the decisions of the courts, in states where no statutory regulations exist requiring liability insurance, are to the effect that permission means a consent to use the car at the time or place or for a purpose authorized by the insured, express or implied. This third element requires that the purpose for which the car is used at the time of the accident be a purpose stated or intended at the time that the bailment is made, but slight deviations are too unimportant to have attached to them by construction the import of annulling the protective features of the policy....... This is the rule which is applicable to the facts in this case. In arriving at this result the court has recognized that the unauthorized using of a bailed automobile constitutes a conversion. Conversion and permission are direct antonyms and cannot exist simultaneously. Since permission would not exist, there would be no reason to impose liability upon the insurer in those circumstances. We adopt the latter view as the rule to be applied in this case.
 
 
 26
 (emphasis added and citation omitted). Hodges v. Ocean Accident & Guarantee Corp., 66 Ga.App. 431, 18 S.E.2d 28, 31-32 (1941).
 
 
 27
 On the basis of the foregoing precedents, it is the legal conclusion of this court that the facts in this case support a finding of conversion under the Georgia law. The district court was therefore in error in finding in favor of the plaintiffs-appellees on their motion for partial summary judgment. The conversion exclusion applies and no coverage is available to Swish. The decision of the district court is reversed and a judgment hereby entered in favor of the defendants-appellants.
 
 
 28
 REVERSED and judgment RENDERED for the defendant, the Manhattan Fire & Marine Insurance Company and/or the Puritan Insurance Company.
 
 
 29
 Also appealed from in this action was the district court's denial of the defendant Southern Marine & Aviation Underwriters, Inc.'s (Southern Marine) motion for summary judgment which was filed May 10, 1979. Plaintiff alleged that Southern Marine was jointly liable to it in the event coverage is provided by the policy. Additionally, plaintiff avers Southern Marine agreed that the expense of recovery would be paid if the basic loss was covered and that they would also be liable for such expenses.
 
 
 30
 The record clearly shows plaintiff's policy was with Puritan. Plaintiff did not have any policy whatsoever with Southern Marine. The plaintiff has failed to state a claim against Southern Marine and thus Southern Marine's motion for summary judgment should have been granted.
 
 
 31
 The rulings appealed from were based on policy coverage having been determined to exist. This finding was erroneous and has been reversed herein.
 
 
 32
 REVERSED and judgment RENDERED for the defendant, Southern Marine & Aviation Underwriters, Inc., on the issues of joint liability for the loss and for recovery expenses.
 
 
 33
 The district court did not rule on defendant Puritan's counterclaim against the plaintiff for reimbursement of the money it had put up to effect the recovery of the aircraft. The case is therefore REMANDED to the district court for further proceedings on the defendant Puritan's counterclaim.
 
 
 
 *
 Honorable Virgil Pittman, U. S. District Judge for the Southern District of Alabama, sitting by designation