ATTORNEY GENERAL v HERMES

Docket No. 65015. Submitted May 18, 1983, at Marquette.—Decided
August 2, 1983. Leave to appeal applied for.

On August 8, 1978, William Hermes and his sons Peter and
Michael were issued membership cards in the Sault Ste. Marie
Chippewa Indian Tribe and cards purporting to permit them to
exercise fishing rights under the treaties between the tribe and
the United States government. On December 20, 1978, the
three individuals were stripped of their tribal membership
when it was discovered that they were not entitled to member-
ship. All three of the individuals were engaged in commercial
fishing and used gill nets on eight separate occasions beginning
September 20, 1978, and continuing through January 26, 1979.
The wholesale value of the fish taken by gill nets was
$17,248.12. On June 2, 1980, the Attorney General in conjunc-
tion with the Michigan Natural Resources Commission and
Howard A. Tanner, Director of the Michigan Department of
Natural Resources, filed suit against the three individuals and
against William L. Hermes, doing business as Big Bay de Noc
Fisheries, in Delta Circuit Court seeking, *inter alia,* damages
based upon unjust enrichment and fraud for the unlawful
taking of fish. Defendants interposed their tribal statuses at the
times the fish were taken as a defense. The court, Clair J.
Hoehn, J., determined that defendants' tribal memberships
were void *ab initio* and could not be asserted as a defense;
rejected plaintiffs' allegations of fraud, finding no evidence that
defendants were acting in bad faith in their application for
tribal membership; and found that plaintiffs had pled sufficient
facts to state a cause of action for conversion and that defen-
dants were liable to the state for the value of the fish in the
state they were in when they came into defendants' hands.
Defendants appeal. *Held:*

1. The trial court erred in determining that defendants'

REFERENCES FOR POINTS IN HEADNOTES

[1] 41 Am Jur 2d, Indians §§ 24, 34.

[2, 4, 5] 35 Am Jur 2d, Fish and Game § 38 *et seq.*

[3] 18 Am Jur 2d, Conversion § 1.

[6] 18 Am Jur 2d, Conversion § 7.

[7] 18 Am Jur 2d, Conversion § 86.

tribal memberships were void *ab initio* and could not be raised as a defense to this suit. Defendants could properly exercise tribal fishing rights from the date of enrollment with the tribe until December 20, 1978, when they were disenrolled. One of the fishing excursions at issue occurred during this period, therefore the trial court's award of damages based upon that incident must be reversed.

2. The state, as public trustee charged with regulation and conservation of wildlife and natural resources in the state, is empowered to bring a common-law civil suit aginst defendants based upon the wrongful appropriation of fish in order to protect the trust corpus.

3. The plaintiffs successfully pled and proved a conversion of the fish taken by defendants.

4. The fact that defendants may have taken the fish in the good faith belief that they were entitled to do so is not a defense.

5. The case is remanded for a correct determination of damages. The trial court erroneously awarded damages based on the wholesale value of the fish, which is a value enhanced by the expense of harvest and transportation to the point of sale. Such an enhanced value should not have been used as a measure of damages since the court found that defendants had not acted fraudulently. The amount of damages awarded by the trial court is to be reduced by the amount of the costs of harvest and transportation of the fish to the point of sale and by the part of the damage award based upon fish taken on September 20, 1978.

Affirmed in part, reversed in part and remanded.

1. INDIANS — PROPERTY RIGHTS — TRIBAL RIGHTS — WITHDRAWAL FROM TRIBE.

Indian tribal rights in property, including hunting and fishing rights, are owned by the tribal entirety and not as a tenancy in common of the individual members; thus, the individual tribe member enjoys a right of user derived from the legal or equitable property right of the tribe in which he is a member, and withdrawal from membership in a tribe generally results in the extinguishment of all individual rights of user in the tribal property.

2. STATE — NATURAL RESOURCES — ACTIONS — PROTECTION OF RE-SOURCES.

The state, as public trustee charged with the regulation and conservation of wildlife and natural resources in the state, may

bring civil actions for damages against persons who unlawfully convert the natural resources of the state to their own benefit.

3. CONVERSION — WRONGFUL DOMINION.

A conversion is any distinct act of dominion wrongfully exerted over another's personal property, and it occurs at the point that such wrongful dominion is asserted.

4. FISH AND FISHERIES — UNLAWFUL FISHING — CONVERSION — STATE.

The state, as public trustee charged with regulation and conservation of wildlife and natural resources, may maintain an action for conversion against fishermen who capture fish in contravention of state regulations; the fish, although not personalty in their natural habitat, may be regarded as having been rendered personalty by the acts of the fishermen.

5. FISH AND FISHERIES — UNLAWFUL FISHING — POSSESSORY RIGHTS.

The capture of fish in contravention of state regulations confers no ownership or possessory rights in the captors.

6. CONVERSION — DEFENSES — GOOD FAITH.

Conversion is an intentional tort to which good faith is not a defense.

7. CONVERSION — DAMAGES.

The measure of damages for conversion is the value of the property at the time of conversion.

*Frank J. Kelley,* Attorney General, *Louis J. Caruso,* Solicitor General, and *Stewart H. Freeman* and *A. Peter Govorchin,* Assistants Attorney General, for the plaintiff.

*Green, Renner, Weisse, Rettig, Rademacher & Clark, P.C.* (by *Nino E. Green),* for defendants.

Before: CYNAR, P.J., and J. H. GILLIS and WAHLS, JJ.

PER CURIAM. The trial court issued an order determining that defendants were liable to plaintiffs for conversion of fish taken under color of tribal fishing rights reserved to the Chippewa

Indians by treaty with the United States government. The court ruled that defendants' tribal memberships, conferred upon them by mistake, could not immunize them from civil liability for unlawful fishing. Defendants appeal as of right.

This appeal compels us to re-examine the nature of the state's property interest in Great Lakes fish and to determine what, if any, civil remedies are available to the state when this interest is violated.

Defendants took 19,084 pounds of perch and whitefish under circumstances that would have been impermissible under the terms of their commercial fishing license. However, pursuant to the Treaty of 1836, 7 Stat 491 (1836), the Chippewa and Ottawa Indians ceded certain Michigan territories to the United States, reserving to themselves fishing rights in the lands ceded; these rights were not relinquished by the Treaty of 1855, 11 Stat 621 (1855). *People v LeBlanc,* 399 Mich 31; 248 NW2d 199 (1976). The state has only limited authority to regulate these rights. *United States v Michigan,* 653 F2d 277, 279 (CA 6, 1981), *cert den* 454 US 1124; 102 S Ct 971; 71 L Ed 2d 110 (1981); *LeBlanc, supra.* Section 1a of the Sportsmen Fishing Law, as it existed during the events in question, provided:

"Any person having Indian status and being a legal resident of the state is exempt from the fishing laws and rules of this state when such laws and rules are in conflict with federal treaty rights. The term 'Indian status' is presumed to refer to those persons of Indian ancestry and enrolled as members of an Indian community." MCL 305.1a; MSA 13.1623(1), repealed by 1980 PA 86, immediately effective April 8.

Defendant William Hermes, proprietor of Big

Bay de Noc Fisheries, and his sons Peter and Michael Hermes applied for membership in the Sault Ste. Marie tribe of Chippewa Indians. The tribe registrar, June Nolan, examined the application and supporting documents. She concluded that one Joseph Beaudin, claimed as part of the Hermes ancestry, was the Joseph Bodwin who appeared on a Soo tribe census roll compiled in 1907. On this basis Nolan made the decision to issue tribal identification cards to defendants. As it turned out, the two Josephs could not possibly have been the same person. Nolan discovered her mistake while researching the ancestry of another applicant, and subsequently notified defendants that they were being disenrolled.

Employees of the Department of Natural Resources observed defendants taking perch and whitefish from the waters of Big Bay de Noc by use of a gill net on eight separate occasions from September 20, 1978, through January 26, 1979. It was stipulated that the wholesale value of the fish taken was $17,248.12.

On June 2, 1980, plaintiffs filed a complaint seeking, *inter alia,* damages based upon unjust enrichment and fraud for the unlawful taking of fish. Defendants interposed as a defense their tribal statuses at the time the fish were taken. Trial was had upon deposition testimony and a set of factual stipulations. In a written opinion, the trial court initially determined that defendants' tribal memberships were void *ab initio* and could not be asserted as a defense. Plaintiffs' allegations of fraud were rejected, the court finding "no evidence that defendants were acting in bad faith in their application for Indian membership". The court also found an award of damages based on unjust enrichment to be problematic:

"* * * Defendants could not be unjustly enriched by receiving the payment for their labor. In addition, the court has no figures on the cost of producing the fish which the court could offset against the market value thereof."

However, the trial court found that plaintiffs had pled sufficient facts to state a cause of action for conversion and concluded: "Defendants converted the fish to their own use and are therefore liable to the State of Michigan for the value thereof." Valuation was fixed at "the market value of the fish in the state they were when they came into the hands of the defendants".

The threshold question is whether the trial court erred in determining that defendants' tribal memberships were void *ab initio* and could not be raised as a defense to this suit.

We believe that the trial court erred in making this ruling. The fishing rights claimed by defendants were aboriginal and were preserved by treaty with the federal government. The basic unit of the federal-Indian relationship is the tribe. See *United States v Washington,* 520 F2d 676, 691 (CA 9, 1975), *cert den* 423 US 1086; 96 S Ct 877; 47 L Ed 2d 97 (1976). Tribal rights in property, including hunting and fishing rights, are owned by the tribal entirety and not as a tenancy in common of the individual members. *Whitefoot v United States,* 293 F2d 658, 661-663 (1961), *cert den* 369 US 818; 82 S Ct 829; 7 L Ed 2d 784 (1962). The individual enjoys a right of user derived from the legal or equitable property right of the tribe of which he is a member. See *Kimball v Callahan,* 590 F2d 768 (CA 9, 1979). This being the case, it has been observed that withdrawal from membership in a tribe would generally result in the extinguishment of all individual rights of user in the

tribal property. *United States v Felter,* 546 F Supp 1002, 1023 (CD Utah, 1982), citing 1 Opinions of the Solicitor of the Department of Interior Relating to Indian Affairs, 811-812 (1979).

Because a right of user arises by virtue of enrollment in the tribe, and does not inhere in the individual by virtue of his blood, we believe that treaty fishing rights vested in defendants by virtue of their enrollment, notwithstanding the fact that membership was mistakenly conferred by the tribal registrar.

We hold that defendants could properly exercise tribal fishing rights from the date of enrollment in the tribe until December 20, 1978, when they were disenrolled by vote of the tribal board of directors. Because one of the fishing excursions at issue occurred on September 20, 1978, the trial court's award of damages based upon that incident must be reversed.

The remaining seven occasions upon which it is stipulated that defendants harvested fish occurred on December 31, 1978, and during the month of January, 1979. Defendants argue that damages may not be assessed for these incidents as they preceded a February 14, 1979, letter from Nolan to defendants, by which defendants claim they were first notified of the tribe's decision. We find this argument unpersuasive. Defendants were afforded written notice of disenrollment proceedings by letter dated December 4, 1978. They were invited to participate in the December 9, 1979, board of directors meeting at which this matter was heard, and it appears that defendant Peter Hermes was present at this meeting. A written memorandum of the December 20, 1978, telephone vote by which defendants were disenrolled recites that the decision was made "due to the fact that there had

been no new documentation brought in during the ten day grace period given [defendants], to show they have Indian ancestry". Defendants therefore knew or should have known how, when and why they were to be formally disenrolled.

The more significant question is whether the state may maintain a common-law civil action against defendants based upon the wrongful appropriation of fish. Because the remedies at issue are tied to notions of property, the nature and extent of Michigan's ownership of Great Lakes fish must be scrutinized. In § 1 of the Commercial Fishing Law, MCL 308.1; MSA 13.1491, the Legislature declared that all fish in Michigan waters of the Great Lakes are the property of the state and that the taking of these fish is a privilege. *Aikens v Conservation Dep't,* 387 Mich 495; 198 NW2d 304 (1972); *Tallman v Dep't of Natural Resources,* 123 Mich App 132; 333 NW2d 193 (1983). The concept that a state had a proprietary interest in fish and other animals ferae naturae is a venerable one, dating back to the common law of England. 2 Blackstone, Commentaries, 403 (1803); *Dep't of Fisheries v Gillette,* 27 Wash App 815; 621 P2d 764 (1980). This concept was also adopted by the United States Supreme Court in *Geer v Connecticut,* 161 US 519; 16 S Ct 600; 40 L Ed 793 (1896).

The theory of state ownership of wildlife, however, underwent a gradual erosion culminating in *Hughes v Oklahoma,* 441 US 322; 99 S Ct 1727; 60 L Ed 2d 250 (1979), wherein *Geer* was overruled. In *Hughes,* a state law prohibiting out-of-state shipment of minnows taken from Oklahoma waters was held violative of the federal interstate commerce clause. Although the Court ruled that a state may not justify protectionist regulations by reliance on ownership or title to animals, it recog-

nized that states retain an important interest in regulation and conservation of wildlife and natural resources. In the wake of *Geer's* decline a new legal fiction has solidified, *i.e.,* that the state is "public trustee" of these resources, which are held in trust for all the people of the state in their collective capacity. *Michigan United Conservation Clubs v Anthony,* 90 Mich App 99; 280 NW2d 883 (1979); *Puerto Rico v S S Zoe Colocotroni,* 628 F2d 652 (CA 1, 1980); *Dep't of Fisheries v Gillette, supra.*

The question is whether this interest is of sufficient stature to support a civil action for damages. Although at least one Court has held that it is not, *Commonwealth v Agway, Inc,* 210 Pa Super 150; 232 A2d 69 (1967), we believe the better authority permits such suits, *Dep't of Environmental Protection v Jersey Central Power & Light Co,* 133 NJ Super 375; 336 A2d 750 (1975), *rev'd on other grounds* 69 NJ 102; 351 A2d 337 (1976); *State v Bowling Green,* 38 Ohio St 2d 281; 313 NE2d 409 (1974); *Dep't of Natural Resources v Amerada Hess Corp,* 350 F Supp 1060 (D Md, 1972). While these cases dealt with the negligent destruction of fish or damage to fisheries, the same principles apply to the illicit harvesting of fish. Such acts affront the state's interest in regulating commercial fishing and may damage its efforts to conserve valuable resources. The power of gill nets and other regulated fishing gear and techniques to threaten entire populations of fish has previously been proven to the satisfaction of this Court. See *MUCC v Anthony, supra,* pp 107-108. If indeed the state is trustee of its waters, it must be empowered to bring suit to protect the trust corpus. *Amerada Hess Corp, supra.*

Having concluded that a civil action may be

maintained by the state to protect its fisheries, we must now consider whether plaintiffs have successfully pled and proved a conversion. A conversion is any distinct act of dominion wrongfully exerted over another's personal property. It occurs at the point that such wrongful dominion is asserted. *Thoma v Tracy Motors Sales, Inc,* 360 Mich 434; 104 NW2d 360 (1960); *Trail Clinic, PC v Bloch,* 114 Mich App 700; 319 NW2d 638 (1982). This theory, while not asserted as such in plaintiffs' complaint, was sufficiently within the scope of plaintiffs' pleadings. GCR 1963, 11.1(1).

We believe that the elements of conversion were fairly proved. There was no question that defendants exercised dominion over the fish. Although the fish in their natural habitat were not personalty, a conversion action may be maintained for property severed from real estate; the property is regarded as having been rendered personalty by the act of the tortfeasor. 18 Am Jur 2d, § 22, p 169. See *Embrey v Weissman,* 74 Mich App 138, 143; 253 NW2d 687 (1977).

While the state has less than a complete property interest in its wildlife, and this interest is subject to constraints such as Indian fishing rights and the federal interstate commerce clause, it is a far superior interest than that enjoyed by defendants. The capture of fish in contravention of state regulations confers no ownership or possessory rights in the captors. *Aikens, supra,* p 502. We reject defendants' assertion on appeal that superior title or right to possession of Great Lakes fish exists in a third party, *i.e.,* the Chippewa Indians. They enjoy only a right to fish which, although broad, is not without limitation. *LeBlanc, supra.*

Finally, the fact that defendants may have taken the fish in the good faith belief that they

were entitled to do so is not a defense. *Willis v Ed Hudson Towing, Inc,* 109 Mich App 344, 349; 311 NW2d 776 (1981), *lv den* 413 Mich 908 (1982); *Warren Tool Co v Stephenson,* 11 Mich App 274, 299; 161 NW2d 133 (1968).

Because we affirm the trial court's judgment that a conversion was shown, we do not address the merits of alternative theories raised in plaintiffs' complaint. We are compelled, however, to remand this cause to the trial court for a correct determination of damages. While the court accurately concluded that the measure of damages for conversion is the value of the property at the time of conversion, *Weissman, supra,* p 144, it awarded damages based on the wholesale value of the fish, which is a value enhanced by the expense of harvest and transportation to the point of sale. Because the court found that defendants had not acted fraudulently, such an enhanced value should not have been used as a measure of damages. See *Anderson v Besser,* 131 Mich 481; 91 NW 737 (1902). We remand for an evidentiary hearing wherein the costs of harvest and transportation to the point of sale are to be determined, and the amount of damages are to be reduced by this amount as well as by that part of the damage award based upon fish taken on September 20, 1978.

Affirmed in part; reversed in part and remanded. We do not retain jurisdiction. No costs, a public question being involved.