782 F.2d 1043
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
PROP ENTERPRISES, INC., a corporation, Plaintiff, and FORD
MOTOR CREDIT COMPANY, a Delaware corporation,
Intervening Plaintiff-Appellee,
v.
SECURITY INSURANCE COMPANY OF HARTFORD, an insurance
corporation, Defendant-Appellant.
 84-1167
 United States Court of Appeals, Sixth Circuit.
 12/16/85
 
 Before: ENGEL and JONES, Circuit Judges; HULL, Chief District Judge.*
 ENGEL, Circuit Judge.
 
 
 1
 Security Insurance Company of Hartford (Security) appeals a summary judgment granted in this Michigan diversity case by the United States District Court for the Eastern District of Michigan in favor of intervening plaintiff Ford Motor Credit Company. At issue is the coverage afforded by Security's insurance policy and more particularly a Lienholder's Interest Endorsement extending limited protection to Ford Credit's security interest in a Cessna 210 aircraft owned by Prop Enterprises, Inc.
 
 
 2
 Ford Credit obtained its security interest in the plane when it loaned Prop the money necessary to purchase the craft. As part of the deal, Ford Credit required Prop to obtain insurance coverage to protect Ford Credit's security interest. Prop purchased an insurance policy from Security insuring Prop against various risks, including loss of the aircraft in a crash. The Lienholder's Interest Endorsement was obviously designed to protect Ford Credit's security interest. A standard provision in the endorsement protected Ford Credit against acts by Prop that might otherwise invalidate the insurance coverage:
 
 
 3
 It is further understood and agreed, AS RESPECTS THE LIENHOLDER'S INTEREST ONLY, that:
 
 
 4
 1. The insurance afforded by the Policy shall not be invalidated as regards the interest of the Lienholder by any act or neglect of the Insured nor by the change in title or ownership of the aircraft, except that the conversion, embezzlement or secretion by a Purchaser, Mortgagor or Lessee in possession under a mortgage, conditional sale or lease agreement of the insured aircraft is not covered hereunder.
 
 
 5
 While the Lienholder's Interest Endorsement stated that the premium of the original policy included the additional premium for that endorsement, the endorsement also provided that:
 
 
 6
 6. Whenever the Company shall pay the Lienholder any sum for loss or damage under this Policy and shall claim that, as to the Named Insured, no liability therefor existed except by the provisions of Paragraph 1:
 
 
 7
 A. The Company shall, to the extent of such payment, be thereupon legally subrogated to all of the rights of the Lienholder under all securities held as collateral to the debt and the Lienholder shall assign and transfer to the Company all instruments of security pertaining to the aircraft, or the Company may, at its sole option, pay to the Lienholder the whole principal due or to grow due on the mortgage with interest and thereupon shall receive a full assignment and transfer of the mortgage and all securities pertaining thereto; provided, however, no subrogation shall impair the right of the Lienholder to recover the full amount of its claim; and
 
 
 8
 B. The Named Insured Agrees, upon demand of the Company, to reimburse the Company to the full amount of any such payment.
 
 
 9
 The underlying and basic Aviation Liability and Physical Damage Policy insuring Prop included as part of its coverage the following:
 
 
 10
 COVERAGE F--All Risks, Ground and Flight. To pay for any direct physical loss of or direct physical damage to the aircraft, including disappearance provided the aircraft is missing and not reported for sixty (60) days after take-off.
 
 
 11
 COVERAGE G--All Risks, Ground only excluding Taxiing. To pay for any direct physical loss of or direct physical damage to the aircraft while not in flight or taxiing.
 
 
 12
 COVERAGE H--All Risks, Ground only including Taxiing. To Pay any direct physical loss of or direct physical damage to the aircraft while not in flight.
 
 
 13
 With respect to coverages F, G, and H (physical damage) the basic policy provided the following exclusions, in relevant part:
 
 
 14
 11. To loss or damage due to conversion, embezzlement or secretion by any person in possession of the aircraft under a bailment, lease, conditional sale, purchase agreement, mortgage or other encumbrance, nor for any loss or damage during or resulting therefrom;
 
 
 15
 * * *
 
 
 16
 * * *
 
 
 17
 14. To loss or damage which is due and confined to wear and tear, deterioration, freezing, mechanical, structural, or electrical breakdown or failure, or to tires unless damaged by fire or stolen, unless any such loss or damage is the direct result of other physical damage coverage by this policy;
 
 
 18
 * * *
 
 
 19
 * * *
 
 
 20
 16. To any aircraft subject to any lien, conditional sale, mortgage or other encumbrance not specifically declared and described in this policy; . . .
 
 
 21
 Because summary judgment was granted in favor of Ford Credit, without any trial, we agree with the district judge that the facts must be undisputed and that inferences therefrom must be construed most favorably to Security.
 
 
 22
 On October 31, 1980, the airplane was totally destroyed in a crash. Ford thereafter sought to recover from Security the amount of Ford's interest which it alleged was protected by the policy in question under the special endorsement.
 
 
 23
 For the purposes of review, we rely primarily on the statement of facts which is included in appellant Security's brief as follows:
 
 
 24
 At the time of the crash, Prop had previously leased the aircraft to Colonial Associates. The terms of the lease were governed by an Equipment Lease Agreement and accompanying Aircraft Rental Agreement. The respective agreements were executed by Richard M. Levine, president of Prop (Lessor) and William Sheck, president of Colonial Associates (Lessee). The clearly stated purpose of William Sheck in leasing the aircraft on behalf of Colonial Associates was to start a charter service with one Bill Hoglund (Sheck Deposition, pp 26-28). Although the aircraft was leased in July of 1980, at the time of the crash in October of 1980, neither William Sheck nor Bill Hoglund had succeeded in procuring a legal name for this phantom charter service, nor had these individuals incorporated the charter service or otherwise obtained an assumed name (Sheck Deposition, pp 26-28).
 
 
 25
 On October 31, 1980, the Cessna 210 crashed approximately eight statute miles southwest of Pearson, Georgia (Joint Pretrial Order). The pilot of the plane at the time of the crash was Phillip Damiano, who was not an authorized or endorsed pilot pursuant to the applicable insurance policy (Joint Pretrial Order). Mr. Damiano's body was found amidst the wreckage of the plane, which included over 800 pounds of baled marijuana (Joint Pretrial Order).
 
 
 26
 In his memorandum opinion in the district court, the trial judge noted that the facts surrounding the crash were in some dispute but that he accepted as true those as stated by the defendant. According to the trial judge those facts, supported by admission even if somewhat different from those in Security's brief here, are stated as follows:
 
 
 27
 At the time of the crash, Prop had leased the airplane to Colonial Associates (Colonial). On October 31, 1981, while the aircraft was at the Ft. Lauderdale Airport, it was stolen. Defendant alleges a Colonial official knew the plane was missing on the date it was removed from the airport and further contends the Colonial official, Mr. Sheck, recruited the pilot, Mr. Damiano, to convert the aircraft. The airplane was subsequently completely destroyed with Mr. Damiano at the controls. Mr. Damiano was not authorized by the insurance policy to fly the airplane. . . . It is admitted that Colonial was a lessee in possession at the time the airplane was taken by Mr. Damiano.
 
 
 28
 To the extent that the trial judge's statement of facts add additional material supported by the record and potentially favorable to the defendant, we accept those facts as well.
 
 
 29
 This litigation was commenced when Prop brought suit upon the policy against Security to recover the value of the lost plane. Ford Credit, having been allowed to intervene, then moved for summary judgment on two grounds: (1) that the language of the endorsement did not exclude coverage in this case because Ford Credit was seeking recovery for destruction of the plane, not for conversion of the plane by any lessee thereof and (2) that the plane could not possibly have been converted by the lessee since all evidence pointed to the fact that if converted at all, it was converted from the lessee. In the alternative Ford Credit argued that if the pilot at the time was acting with the consent of Colonial Associates, there could have been no conversion because Colonial Associates already had lawful possession of the airplane under a written lease. In defense Security maintains that the airplane had been converted by Colonial Associates at the time it crashed and that, therefore, coverage was specifically excluded under the terms of the endorsement. The district court granted summary judgment for Ford Credit Company in the amount of $64,000.00, the undisputed balance due on the mortgage. The district court certified that judgment for immediate appeal under Fed. R. Civ. P. 54(b). Security appeals. We affirm.
 
 
 30
 In granting summary judgment in favor of Ford Credit the district court appears to have followed two relatively distinct lines of reason. As its first basis, the trial court cited Michigan law describing conversion as an intentional tort, Thoma v. Tracy Motor Sales, Inc., 360 Mich. 434, 104 N.W.2d 360 (1960). Because it was obvious that the destruction of the airplane in this case was not in any event intentional, the district court reasoned that Ford's loss therefore was not occasioned by conversion. However, the court then went on to say that although the insurance policy included coverage for losses 'due to conversion' it did not exclude coverage for 'damages proximately caused by conversion.' Citing Michigan case law which required it to construe ambiguous terms in favor of the insured, Ebert v. Prudential Ins. Co., 338 Mich. 320, 61 N.W.2d 164 (1953); Arrigo's Fleet Service, Inc. v. Aetna Life & Cas. Co., 54 Mich. App. 482, 221 N.W.2d 206 (1974), the court concluded: '[s]ince there is no exclusion for damages proximately caused by conversion, coverage is not defeated by this exclusion.' Arrigo's Fleet, 221 N.W.2d at 209. Implicit in this reasoning was the court's belief that even if the plane had been converted in a technical sense, coverage was not thereby excluded where the actual loss was due to the wreck of the aircraft, not to the conversion. The second position was based upon a rather refined reasoning that under existing Michigan case law, insurance contracts are normally strongly construed against the insurer who is normally the author of them. When we construe the terms of the policy here in the context of the whole, the district court's opinion appears well supported by Michigan law even though no Michigan cases have been cited involving precisely the state of facts which arose. Generally, however, most case law, including that in Michigan, seems to address the question of tort liability in terms of the Restatement of Torts. Michigan courts have frequently relied upon the Restatement, see, e.g., Thoma v. Tracy Motor Sales, Inc., 360 Mich. 434, 438, 104 N.W.2d 360, 362 (1960) (citing Restatement of Torts); Warren Tool Co. v. Stephenson, 11 Mich. App. 274, 299, 161 N.W.2d 133, 147 (1968) (citing Restatement of Tort 2d). Section 228 of the Restatement of Torts 2d provides:
 
 Sec. 228. Exceeding Authorized Use
 
 31
 One who is authorized to make a particular use of a chattel, and uses it in a manner exceeding the authorization, is subject to liability for conversion to another whose right to control the use of the chattel is thereby seriously violated.
 
 
 32
 Illustration 6 following section 228 is quite similar to the facts in this case. In that illustration, A rents an automobile to B to drive to X City and return. In violation of the agreement, B drives to Y City, ten miles beyond X City, where the automobile is seriously damaged in a collision, with or without negligence on the part of B. The illustration concludes that this is a conversion.
 
 
 33
 Even closer to the facts here are those which are contained in illustration 23 to section 222A indicating that where one entrusts on automobile to another for the purposes of selling it, and the agent uses the vehicle for transportation of contraband, as a result of which it is confiscated by the authorities, a conversion has occurred.
 
 
 34
 Appellants also rely upon at least three courts in other jurisdictions who have referred to Section 228 of the Restatement in holding that a lessee's use of an airplane to smuggle drugs in violation of the lease agreement constitutes conversion. National Union Fire Insurance Co. v. Carib Aviation, Inc., 759 F.2d 873 (11th Cir. 1985) (applying Florida law); Swish Manufacturing Southeast v. Manhattan Fire & Marine Insurance Co., 675 F.2d 1218 (11th Cir. 1982) (applying Georgia law); Gelder v. Puritan Insurance Co., 668 P.2d 1117 (N.M. Ct. App. 1983) (applying New Mexico law).
 
 
 35
 In each of these cases, two of which, Swith and Gelder, were expressly cited by appellant, the courts construed somewhat similar exclusionary clauses to deny coverage on the theory that the aircraft had been converted. However, it is significant in our view that in each case, while the exclusionary clause was similar there was added to it an exclusion not only for 'loss or damage due to conversion' but also for 'any loss or damage during or resulting therefrom.' (emphasis added). The former language is significantly missing from the policy in question here. It is a difference which we believe entitled the court to reach a different result.
 
 
 36
 As a threshold matter, Security argues that there was at best an ambiguity in the policy which required that the intentions of the parties be submitted to the jury as a question of fact and that therefore summary judgment was in all respects inappropriate. In response to this we note that the cases which have considered the question appear to have all resolved the question of the contract interpretation as a matter of the particular law of the state and not as a matter of fact. So much was true in this case. We also believe that considerable deference in this respect is due the Michigan federal judge here whose experience assures us that he will be more intimately conversant with both the case and statutory law of that state, and equally important has endowed him with the unique 'feel' for state law which comes from that long association. Equally persuasive upon us, however, is the strong emphasis which Michigan courts have historically placed in construing ambiguities in insurance contracts against the insurer.
 
 
 37
 The Court has consistently adhered to certain fundamental rules in construing an insurance policy. If the provisions as a whole are ambiguous or obscure, they are liberally construed in favor of the insured.
 
 
 38
 Ebert, 61 N.W.2d at 167.
 
 
 39
 While we are aware of cases which treat conversion in its broadest form to mean any distinct act of dominion wrongfully exerted over another's personal property, Thoma v. Tracy Motor Sales, Inc., 360 Mich. 434, 104 N.W.2d 360 (1960); Attorney Gen. v. Hermes, 127 Mich. App. 777, 339 N.W.2d 545 (1983), plainly when the term is used in connection with the coverage of a lienholder, the cited language of the endorsement precludes so broad a reading. Instead, conversion, in the context in which it is used in the endorsement, is equated with 'embezzlement or secretion by a purchasor, mortgagor or lessee in possession under a mortgage, conditional sale or lease agreement of the insured aircraft.' In that context, the use of the term is initially far more similar to illustration 23 of section 222A of the Restatement. That illustration contemplates not physical damage to the aircraft but instead its loss because of the nature of its use and the danger that such use may result in its confiscation or conversion by others by reason thereof. Nowhere in the exclusion is the question of physical damage to the aircraft mentioned. By contrast, in each of the three cases cited from other states, the general language of conversion was amplified by an express reference to 'any loss or damage during or resulting therefrom.' The absence of that language in the Lienholder's Interest Endorsement here is we think controlling especially when the basic policy and endorsement are read together, as we believe they were intended to be.
 
 
 40
 The basic policy and the separate endorsement recognize the legally and factually distinct differences in interest of the basic insured and of the lienholder. The endorsement therefore makes specific provision for an extra consideration to be paid if needed for the lienholder's interest. It indicates that the additional premium has been included in the premium charged to the primary insured. Further, the Lienholder's Interest Endorsement at paragraph 1 thereof expressly provides that if the named insured shall neglect to pay any premium under the policy, 'the lienholder shall, on demand of the company, pay the same.' That same provision places upon the lienholder the duty to notify the company of any changes which shall come to its attention and which might, if known, affect the risk. It is nowhere suggested in this appeal that Ford Credit had any knowledge whatever of the activities which ultimately brought on the illegal use and loss.
 
 
 41
 Finally, the endorsement at paragraph 6[1] expressly recognizes the difference between the interests of the primary insured and those of the lienholder by expressly granting to the insurer the right of subrogation in those instances in which its obligation to the lienholder under the endorsement shall exceed its obligation to the basic policyholder. Thus the insurer is, to the extent it pays the lienholder, entitled to an assignment of all the lienholder's interest which otherwise exists in the aircraft and it is further provided that no subrogation, presumably of the insurer to the rights to the basic policyholder 'shall impair the right of the lienholder to recover the full amount of its claim.'
 
 
 42
 The conclusion we reach, accordingly, is that under the foregoing circumstances, Ford Credit was fully entitled to maintain its right of recovery under the policy to the extent its loss was occasioned by the physical damage and destruction of the aircraft. This seems to have been the full and plain intent of the policy. There is nowhere in the endorsement any exclusion which arises under circumstances where the loss is caused by the physical destruction of the aircraft. In contrast the basic policy leaves no question that its purpose was primarily to cover losses resulting from the damage or destruction of the aircraft and it also leaves no question as to those circumstances in which such losses could not be recovered by the basic insured. Because Security has shown that it knew how to specify both such coverage and such exclusion when it intended to do so, we are bound to conclude that the failure to add additional language as it was found in the other cited cases, clearly indicates an intent to protect Ford Credit's security interest.
 
 
 43
 AFFIRMED. Judge Jones concurs in the result.
 
 
 
 *
 Honorable Thomas G. Hull, Chief Judge for the United States District Court for the Eastern District of Tennessee, sitting by designation
 
 
 [1]
 See p. 2, supra